ELIHU B. FROST, as trustee, &c.,

*v.*

HENRY R. CARSE et al.

[Decided May 13th, 1919.]

On a bill to remove a trustee of a voting trust, who was also the president of the company, on the ground that he extravagantly employed an
agent to endeavor to obtain certain contracts, and paid him $40,000;
that he participated with others in a distribution of the profits of the
company in the form of bonuses, aggregating $400.000; that he violated
the spirit of the voting trust agreement, in that he interfered with the
technical force at the company's plant, and that he insisted upon the
resignation of one of the directors of the company, contrary to the spirit
of the voting trust agreement—*Held*, that while the charges, so far as
they are proved, do not justify the granting of the relief prayed for, yet
the situation of the voting trustees demands the appointment of one not
interested in the company to fill a vacancy in such voting trustees, and
that this court will make such appointment.

On bill, &c.

*Messrs. McCarter & English* and *Mr. Maurice Deiches,* for
the complainant.

*Messrs. Pitney, Hardin & Skinner* and *Mr. William M. J.
Stroch* (of the New York bar), for the defendants Henry R.
Carse, Henry R. Sutphen and Thomas C. Dawson.

*Messrs. Stein, Stein & Hannoch,* for the defendant Submarine
Boat Corporation.

LANE, V. C. (orally).

The bill is filed by Elihu B. Frost as trustee under an agreement made April 1st, 1915, between Henry R. Carse, Lawrence
Y. Spear, Henry R. Sutphen, Stacy C. Richmond and Thomas
C. Dawson, as trustees, as parties of one part, and such of the

stockholders of the Electric Boat Company as should come in under the trust, as parties of the other part, under the conditions of which, for five years, the right to elect directors of the Electric Boat Company was to be exercised by the trustees. The case is fresh in the minds of all, and I am not going to relate the testimony in any considerable detail. I am going to express as briefly as I can the conclusion to which I have arrived and the reasons underlying it. The charge made by Frost is, that Carse, a co-trustee, and the president of the Electric Boat Company and the Submarine Boat Corporation, hereafter mentioned, since October 1st, 1915, has so conducted himself as trustee as that this court should remove him. The Electric Boat Company was incorporated in 1899 for the purpose of developing the submarine. The Holland Boat Company had preceded it and the Electric Boat Company took over the Holland business. I think the Electric Boat Company was incorporated at or about the time when Rice came into the proposition, induced to do so by reason of a debt due from the enterprise to him. From 1899 to 1914 the enterprise had very hard sledding. It was supported almost altogether by Rice and Frost; the keeping of the enterprise alive is due to no one living now more than to Frost, the complainant. Spear had come into the enterprise, about the time of the incorporation of the Electric Boat Company, as an engineer; he was a naval constructor and was converted by Frost to the idea of the submarine. He gave up his position in the navy and associated himself with the enterprise. The technical force had been established in New London. About the outbreak of the war the company was operating, as I have before indicated, with very uncertain chances of anything ever coming of it. Carse was the vice-president of the Hanover National Bank and came in contact with those who were behind the Electric Boat Company through its banking operations. Money to support the enterprise was borrowed by the company, or by Rice and Frost, from the bank from time to time, in large sums. There is no doubt but that both Rice and Frost sought the advice of Carse and that he gave them advice to the best of his ability. He was a director of the concern on two different occasions, I think, resigning, however, in February, 1913, so far as the testimony

shows, because he thought at that time that there was very little hope. The war broke out, and as a result the company became a financial success. Rice, who had been its president, was ill and finally was compelled, in the year 1915, during a time that contracts were being performed by the company for various governments, to resign, and the company cast about for a successor. Carse had been called in as confidential adviser on or about October 1st, 1914, and continued to act in that capacity up until the time he assumed the presidency, October 1st, 1915. There is no doubt but that all concerned, including Frost, thought it would be most advantageous to the company to get Carse in as the chief executive officer. The letter of Frost to Carse, in which he invites Carse to become president, indicates quite clearly what was in Frost's mind at the time. In 1915, it was conceived by those who were behind the company that, in order that it might remain staple, its stock should be trusteed in such a manner as that the voting power should be in a few hands, and those hands the management. The result was that this voting trust agreement was entered into by the stockholders of the Electric Boat, in April, 1915, the avowed purpose being to prevent the voting power being acquired by interests which might be antagonistic to the corporate management and which might be antagonistic to the government, to retain the management as it was for at least a period of five years. In furtherance of the same scheme contracts were entered into by the various executive officers and the members of the technical force under which they agreed to serve the company for a period of five years, among whom, when he assumed the office of president, was Carse. Now, there is no evidence in this case whatever that Carse injected himself into this enterprise; no evidence whatever that he sought the office of president; the evidence is all to the contrary; all parties agree that, peculiar as the fact may be, the office sought him. He hesitated a considerable length of time before he agreed to accept it. He had an assured position, a life position, in the bank, at a salary of some $22,000 a year, and, undoubtedly, it was somewhat of a wrench for him to take an executive position of this kind in a concern of this nature, an entirely different kind of work from anything he had previously performed. I

have no doubt whatever but that he, and all who were associated with him, acted in perfect good faith.

About the same time that the Electric Boat stock was trusteed, a corporation known as Submarine Boat was formed for the purpose of holding the certificates of trust of Electric Boat, the object being to reduce the par value of these certificates for trading purposes. The stock of Submarine Boat was trusteed in the same manner as that of Electric Boat. The management of Electric Boat and Submarine Boat are the same. The details I have set forth in my conclusions on motion to strike out the bill and on motion of Submarine Boat for leave to file a counterclaim.

The charges made by Frost against Carse, which are of any importance, I think may be reduced to four. First, that during the month of December, 1915, Carse employed Malcolm Ross McAdoo, a brother of William G. McAdoo, under an agreement by which certain moneys were to be paid by Carse to McAdoo, a portion to be used by McAdoo for the purpose of bribery, for that is what it amounts to, and that in order to cover up this transaction, he obtained from the corporation, in December, 1915, ostensibly, as a bonus, the sum of $75,000; that $40,000 of this bonus represented money which he had been obliged to pay McAdoo. I here repeat what I said before the argument: "I might say, here, that there has not been in this case a scintilla of evidence or anything shown from which any inference can be derived, that whatever the relations were between Mr. Carse and Mr. Malcolm McAdoo, that William G. McAdoo had any knowledge or information about it. There is nothing in the case which indicated or from which an inference of that kind might be drawn." Whatever the fact may be, and I am not going to determine the fact to-night, Frost had complete knowledge of the transaction at or about the time of its happening, and, although, according to his testimony, he protested, nevertheless, afterwards, Malcolm Ross McAdoo was retained, with the acquiescence of Frost, as a representative of this corporation. Carse denies absolutely that he ever told either Frost or Johnson, who was the counsel of the company (Johnson corroborating Frost), that he had given McAdoo any amount of money to pay to any-

body else. His story of the transaction is that McAdoo, whom he had known some years before, came into his office, in the fall of 1915, and represented to him that he had a contract for the disposition of certain war material and wanted Carse's help. This deal of McAdoo's came to naught. Carse then realizing McAdoo's ability, thought he might be a good person to investigate for him in Washington, in order to find out, as he puts it, the cause of antipathy of officials in Washington toward the company, and Carse says that when he took this up with McAdoo, McAdoo stated that it was necessary for him to have certain moneys in order to rehabilitate himself before he could properly represent the company, and that he, Carse, first gave him $100 to go to Washington in order that he might ascertain whether his brother had any objections to his representation of the company in Washington; that Ross McAdoo reported that he had seen his brother and that his brother had seen other officials of the government, and that they all agreed that there was no impropriety in Ross' acting. Carse states that he gave McAdoo $40,000, $15,000 on December 2d, 1914; $15,000 on January 14th, 1915, and $10,000 on January 20th, and that he took notes for these advances and copies are produced. Carse made no effort, so far as the testimony has disclosed, to ascertain whether in fact McAdoo used the money to rehabilitate himself. The money was all advanced by Carse to McAdoo in cash, so there is no written evidence of the transaction, although some such transaction, unquestionably, took place; no reports from McAdoo are produced here, although the testimony is that such reports were made. Whether this history of Carse's transactions with McAdoo is correct or not, I am not now going to determine —it is not necessary to determine it. Frost and Johnson both swear positively that Carse told them that he had paid this $40,-000 to McAdoo for the account of the company, and that that was the reason why he insisted that he should get a bonus of such a large amount as $75,000. Of the $75,000 actually paid him Carse says that he gave Frost $15,000 in cash. Counsel for Carse argued that Frost and Johnson cannot be telling the truth, because it clearly appears that the amount of the bonus was not only actually fixed, but that the moneys were actually paid some

time before the two advances to Mr. McAdoo—one for $15,000 and the other for $10,000—were made, and that is the fact. I might say in passing that, so far as I now recollect, the story with respect to this transaction is the only story that has been told during the entire case, upon which there is any substantial conflict of testimony; if there is any apparent conflict in any of the others, the conflict can readily be attributed to matters of recollection or whatnot; in this particular instance there is a clear-cut issue of fact. However this may be, it seems to me that, assuming the story told by Frost and Johnson to be the true one, the fact that Carse acted in the manner in which they say he did is not sufficient cause at this time for removing him, nor do I think it sufficient in connection with the other charges made against him to warrant his removal. What a man did in 1915 I do not think can be urged now in 1919 as a ground for his removal as a trustee where his act had no connection whatever with the exercise of his duty as trustee, nor do I think that even if he had performed the acts, which it is charged that he did, it indicates such a state or condition of mind as that he should not be trusted to exercise the duty imposed upon him by this trust agreement.

The second charge is, that he participated in the distribution of a bonus at the end of December, 1915. It is a fact that some $400,000 of the profits of the company were distributed to the executive officers, by the vote of the directors, and that Carse was a member of the committee which advised the distribution of the bonus and which fixed the amounts. That distribution may have been illegal. I am not obliged to pass upon it at this time. If it were illegal, at least, the parties acted upon the advice of counsel. The directors authorized the distribution unless counsel advised otherwise, and counsel did not advise otherwise. It was a natural desire on the part of those who had stood behind this enterprise in its lean years to make some profit when the enterprise became successful. If Spear, Frost, or most of the others who participated in this bonus, had thrown up their hands three, two, or even one year before the war, there would have been nothing whatever for stockholders, or, practically, nothing. Because of their faith in the enterprise and the work that they did

the result was a great benefit to stockholders, an enormous profit for 1915, and they had a legitimate, at least, a reasonable—I am not saying whether it was legal or illegal—from a human standpoint, they had a legitimate desire to share in this extraordinary profit. Frost got out of the bonus either $125,000 or $140,000; Spear, who stood by the enterprise from 1899, $70,000; Sutphen, $60,000; Dawson, I think, $60,000, and Johnson, who had acted as counsel for the company for years, $10,000, and then upon his protest an additional $10,000. The check to Carse was $75,000. Carse had only been connected with the company as an executive since October 1st, 1915, a period of some three months; he had, however, been associated with it in an advisory capacity from October 1st, 1914, and he had, undoubtedly, during the years in which he was a director preceding 1913, stood loyally by the company as a banker and helped it over some undoubtedly rough places. Now, whether he was entitled to the $75,000 or not is a matter which may admit of controversy, but the time that the controversy should have taken place was December, 1915. According to the testimony of Frost and Johnson, it did take place, and all concerned agreed that Carse's $75,000 was not, under the circumstances as they existed at the time, exorbitant. Whether it was or whether it wasn't is a matter I am not now called upon to determine. Of course, if Carse had used his position as president of the company to get a bonus which could not be justified upon any possible theory, a different situation would be at once created. No such thing as that took place. These men at that time were men who were fully aware of their own rights; none of them were infants, and whatever dispute arose was adjusted to the mutual satisfaction of all concerned. The mere fact that Carse may have gotten more out of the company than he was entitled to, if he did, is not sufficient to require his removal as voting trustee.

The third charge is, that he violated the spirit of the voting trust agreement, in that he interfered with the technical force in New London, to such an extent as that after he had been in office for a year and a half the force was almost at the point of disruption. There is no doubt whatever but that interference of Carse with the technical force in New London created dissension.

Spear and Cable had been supreme under the old management within their own restricted sphere. The New London plant was their baby, and they considered that any interference with New London was unwarranted and not to be tolerated. Spear said they would all resign in a body if there was any attempt made to interfere with New London. Carse, prior to his assuming the presidency of this corporation, had been vice-president of a bank; he had been in this bank from the time he was twenty; he had gotten accustomed to banking ways, to the spirit of absolute obedience from the head down to the bottom, and, undoubtedly, when he first went into the Electric Boat Company he carried with him his banking ideas. He had, undoubtedly, to learn to live with those who were in the company at that time; who had been there for years before him; on the other hand, they had to learn to live with him; that they might make mistakes; and I can very readily appreciate that, during the first few months, there was friction—there was bound to be friction. Carse was endeavoring to introduce economy into the company; the technical force was replying that economy in certain cases was false economy, and that conflict had to go on until some mutual basis was reached, and I have no doubt but that both sides of the controversy were hot-headed, and that Frost rendered service to the company in endeavoring to keep peace. Whatever friction there was was due to their ideas that their own judgments were right, and which was right and which was wrong I am not obliged to determine. The parties determined which was wrong themselves, because it appears now that since the middle of 1917 there has been peace and harmony in that concern, that each gave in a little, with the result that the entire enterprise has benefited. If Carse erred in judgment that is no cause for his removal, unless his error of judgment was such that no reasonable man would commit (and I cannot find that in this case), or unless he acted for some fraudulent purpose or whatnot, and I can find no evidence whatever in this case that Carse has ever acted in any manner other than what he considered to be for the best interests of the corporation. Prior to 1917, during the time that this friction was alive, there was considerable controversy between Frost and Carse; they could not get along together with

the result that matters finally reached such a stage that, prior to the general meeting of the stockholders of the corporation in 1917, Carse put to the board of directors the proposition that either he or Frost must go, with the result that at the meeting of 1917, with the vote of ·Carse, Frost and Johnson were dropped from the directorate of the company, and it is fourthly charged that Carse's action in taking the attitude that he did at that time, in view of the voting trust agreement, which in spirit, at least, provided for the continuance of the entire management, and his retention of himself in the management of the Electric Boat by the use of his own vote should induce the court to remove him. Carse was in rather an unfortunate position. I have no doubt but that he was fully imbued with the idea that the best interests of this corporation required that there should not be dissension, and he was perfectly willing, I think, to get out, if necessary, and he had a fixed idea that it had to be Frost or himself. It is hard to say what he could have done under the circumstances. He was obliged either to vote himself out or vote himself in, and it is not to be expected that he should vote himself out, yet that is what he would have had to do if he had not voted himself in, and it is because of the fact that the voting trustees in this particular instance are officers of the company, interested themselves in the result of the vote, that such a thing is necessary. I cannot say that Carse voted himself in merely because of a desire to stay in. I think he voted himself in because he considered that the best interests of this corporation required that he should stay in, and there is absolutely no evidence before me to show that the best interests of the corporation did not require that the management which is now in control should not have been continued. Upon the whole it seems to me to be quite clear that there has not been shown sufficient to warrant this court in interfering at this time and·removing Carse. I think, however, that the testimony demonstrates that there ought to be on this board ,of trustees someone who has no interest in any manner in the management, and that a successor trustee to take the place of Richmond should be appointed by the court. As I have before indicated, it is impossible for the voting trustees to continue the management without voting in some way or

another in their own interest. None of them, I think, are free from that criticism. Richmond is dead. There is a vacancy. The voting trust provides that a majority of the surviving trustees may elect his successor, but, because of the situation which has developed, it seems to me that the voting trustees ought not to exercise the power under that article of the agreement, but that the court should appoint an independent trustee.

Now, this comes at the end of a long day, and while, perhaps, I have not expressed myself as clearly as I should have, I think that counsel have generally what my ideas are.

(After colloquy between court and counsel all parties agreeing to the appointment by the court to a successor of Mr. Richmond, Mr. Edward D. Duffield was appointed as trustee.)