JOHN R. PERRY,

*vs.*

MISSOURI-KANSAS PIPE LINE COMPANY, a corporation of .the State of Delaware, HENRY T. BUSH and C. RAY PHILLIPS, Receivers of Missouri-Kansas Pipe Line Company, FRANK P. PARISH, a Voting Trustee under a purported Voting Trust Agreement dated April 1, 1930, in respect to Class "B" Stock of Missouri-Kansas Pipe Line Company, ARTHUR G. LOGAN and ROBERT V. WHITE, who succeeded respectively Francis I. duPont and Ralph G. Crandall as Voting Trustees under said purported agreement, and ALBERT L. MASSEY.

*New Castle, May 4, 1937.*

*William Prickett,* of Wilmington, and *Kenneth E. Walser,* of the firm of Spence, Hopkins, Walser & Hotchkiss, of New York City, for complainant.

*Caleb S. Layton,* of the firm of Richards, Layton & Finger, of Wilmington, and *Dupuy G. Warrick,* of Kansas City, Mo., for demurrant.

THE CHANCELLOR: The voting trust agreement was formed on April 1, 1930. By the express terms of its ninth paragraph it was "to continue in full force and effect until April 1st, 1941." Thus the trust was given a life of eleven years.

The trust was created by virtue of the power conferred by *Section* 18 of the *General Corporation Law (Section* 2050, *Rev. Code* 1935), which provides that voting trust agreements may be formed by one or more stockholders, to have a duration for any period of time "not exceeding ten years."

The complainant contends that as the voting trust in this case was given a life of eleven years, it is in violation of the express terms of the statute and is therefore void.

The demurrant contends first, that notwithstanding the language of the agreement, quoted *supra,* which extends the agreement over a period of eleven years, yet it was to continue in existence for only ten years, for the reason hereafter stated; but second, if it be conceded that the period of eleven years was in fact the intended duration of the agreement, it does not follow that the agreement was void—the law would allow it to be operative for the permitted period of ten years. Other contentions are advanced which are hereinafter noticed.

1. The first contention is based on the proposition that the agreement itself contains evidence that the date April 1, 1941, was mistakenly inserted therein. That date occurs at the point in the agreement already referred to, and at another place in the same ninth paragraph where it is provided that the agreement might be extended beyond April 1, 1941, upon compliance with the specified requirements.

Thus far, then, the agreement was one for eleven years. What is pointed to by the demurrant as showing that 1941 means 1940? It is principally this, that in the form of the voting trust certificates which the trustees issued to the stockholders, set out in the agreement, it is provided that no certificate of stock shall be deliverable by the trustees before April 1, 1940. That language appearing merely in the prescribed form of the voting trust certificate, even if it be regarded as a substantive term in the contract having equal dignity with those paragraphs of the agreement which avowedly embody the contract's substantial terms, as does paragraph nine, cannot nevertheless be said to be irreconcilable with the intended continuance of the trust until 1941.

Furthermore, it is argued by the demurrant, that it is to be noted that when in the ninth paragraph, it is provided that the agreement may be extended, such extension is to

be for a further period "not exceeding ten years," from which we are to infer that the life of the original was not to be for a longer period than ten years. But this inference is clearly a *non sequitur*. Because the parties were unwilling to agree to an extension beyond ten years, does not mean that they must necessarily have refused to let the original term run as long as eleven years.

So that, taking the language as we find it, there is nothing which appears that drives us to the conclusion that the date of April 1, 1941, which is found twice in the body of the instrument with all the appearance of deliberation in its use, is to be read as though it were April 1, 1940.

That which suggests more than anything else that 1941 really means 1940 is this—that it is hard to believe that parties would by the use of 1941 deliberately draft an instrument which the statute condemned. But it has never been held that illegality in an instrument is in itself a justification for construing its terms so as to make it legal.

If the use of the date of 1941 was in truth the result of a mistake, I must nevertheless hold on this demurrer that the instrument stands as written. So holding, the trust is one whose duration is forbidden by the statute.

2. What, then, is the result? Must the trust fail altogether, or may it, as the demurrant contends, stand for the shorter but lawful period of ten years? In other words, does the statute declare total invalidity, or does it place only a limitation on the exercise of a lawful power?

The demurrant argues that under what his solicitors call the common law of this State, voting trusts, when organized for a proper purpose, were entirely lawful and all that the statute did was to impose upon them a restriction as to their duration. They cite the analogy of the rule said by the court in *Robertson v. Hayes*, 83 *Ala.* 290, 3 *So.* 674, 675, to be applicable to leases, which is that where a general

power to lease exists, as it does in all jurisdictions, and a statute is enacted restricting the period of lease to a definite number of years, a lease which exceeds in duration the restricted period is invalid only as to the excess. Another analogy is also cited. It is the principle which this court recognized in *Capital Bakers, Inc., v. Leahy*, 20 *Del. Ch.* 407, 178 *A.* 648, where it was held in a case involving an agreement in restraint of trade, that if the territory in which the restraint was operative was unreasonably broad in area, yet if it was clearly divisible, so that the lawful area could be separated from the unlawful, a court of equity would enforce the contract to the extent it was lawful and refuse recognition to it to the extent it was unlawful.

But the available analogies are not all on the side of the demurrant. What for instance is to be found in the law of restraints on alienation? Take the case of accumulations. It is the general rule, I believe, that at common law accumulations are denounced as against public policy if they continue for a longer period than that which is allowable under the rule against perpetuities. Suppose accumulations are directed by a testator or trustor to continue for a longer period than the allowable one, what is the result? Is the scheme for accumulations void *in toto* or only to the extent of the excess? There are numerous statutes, starting with the *Thelluson Act* in England enacted in 1800, which provide that the scheme is unlawful only as to the excess above the period allowed by the law for its continuance.

But, absent a statute, what is the rule? It is, of course, hardly proper for me in this case to answer that question in a decisive way. To do so would be to utter the plainest kind of dictum. But it is not out of order, as analogies are appealed to for support of a particular principle of construction for guidance in this case, to observe that quite respectable authority may be found for the proposition that where a provision is made for accumulations beyond the

allowable period, the provision is void *in toto* and not merely as to the excess. *Southampton v. Hertford,* 2 *Ves. & B.* 54, 35 *Eng. Reprint* 239. In 1 *Perry on Trusts,* (7th Ed.) 665, it is said—"If a trust for accumulations may possibly exceed this limit (meaning the limit set by the rule against perpetuities), it is wholly void, and it cannot be cut down to the legal limit." See also 2 *Simes, Future Interests,* § 589. Professor Bogert in his work on *Trusts,* (1921) *p.* 178, states that such a trust is void. It is true that in his work on *Trusts and Trustees,* (1926) *Vol.* 1, § 215, he indicates that it might be void only as to the excess. But he cites *Hussey v. Sargent,* 116 *Ky.* 53, 75 *S. W.* 211, as his authority. That case, however, holds that under Kentucky law the trust would be void, but that under the law of New Hampshire which governed the case, it was void only as to the excess, the New Hampshire case applying a sort of *cy pres* doctrine to the trust. Two other cases are cited by Professor Bogert in opposition to the New Hampshire rule, one from Connecticut and one from Florida.

I have not examined the authorities on the question presented in the preceding paragraph with that degree of care which I would if its answer were directly involved in the instant case. Enough, however, appears from the foregoing to show that something by way of analogy in connection with the rule governing accumulations can be produced from cases and textwriters to show that not always does the law, in its effort to serve a declared public policy, accord partial recognition to an act that offends against it.

But the demurrant's position confessedly rests on the proposition that it is only when a general power to create a continuing relation already exists under the law, that a statute restricting the duration of the relation will not be construed as avoiding it altogether. The case from 83 *Ala. supra,* which the demurrant cites as a leading case, recognized that view. Hence, it is necessary for the demurrant's argument to establish as an acceptable proposition that in

Delaware, prior to the statute, voting trusts were lawful. No Delaware decision has so declared. The case of *Mackin v. Nicollet Hotel, Inc.*, 25 *F.* (2d) 783 (*C. C. A. 8th Circuit*) is cited by the demurrant as establishing that voting trusts in Delaware were good at common law. Without pausing to discuss whether the federal court in the Eighth Circuit is qualified, in the absence of Delaware decisions, to declare, at least for this jurisdiction, what is the common law here, it is enough to say of the case that it does not undertake to make any declaration of that kind.

It is, I think, fair to say that the situation here with respect to the legality of voting trusts prior to the enactment of any statute dealing with the subject, is similar to that which prevailed in New York prior to the enactment in that state of its statute dealing with the subject. The Court of Appeals in New York in the case of *Matter of Morse*, 247 *N. Y.* 290, 160 *N. E.* 374, 376, pointed out the conflict in the authorities upon the question of whether so-called voting trusts were, in the absence of statute, in contravention of public policy and therefore void. The cases upon the question are rather numerous. They are reviewed and discussed in 18 *Columbia Law Review*, 123, and 22 *Ibid.* 627. Prior to the statute in New York it appears that the courts of that state had never been called upon to pass upon the question of the legality of a voting trust. In the cited case the Court of Appeals, in interpreting the statute, disregarded as an immaterial aid the question of how a voting trust would have stood in the eyes of the law prior to the statute's enactment. It held in substance that the rule of the statute supplied the sole test of validity. The court's language was:

"In New York voting trusts do not stand or fall on common-law theories of public policy. They are recognized and regulated by statute. Whether they would be valid at common law in the absence of a statute defining and regulating them is immaterial. Public policy in regard thereto is defined by the Legislature. Between the

conflicting rules of the common law, a choice has been made. *No voting trust not within the terms of the statute is legal*, and any such trust, so long as its purpose is legitimate, coming within its terms, is legal. *The test of validity is the rule of the statute. When the field was entered by the Legislature it was fully occupied and no place was left for other voting trusts.* * * *

"Voting trusts are, therefore, legal in New York only when organized and existing under the statute for proper ends. *Whatever the rule of the common law may have been, when the Legislature, the source of corporate power and authority, acts, voting trusts become legal when organized in conformity with the statute and not otherwise.*" (Italics supplied.)

The purport of this is necessarily to the effect that voting trusts generally are condemned as illegal, but that the state has granted a permissive power to create them to a limited extent. The principle announced by the Alabama court in the case of *Robertson v. Hayes, supra,* relied on so strongly by the demurrant, in speaking of leases appears to be directly in point, viz., that where a statute takes the form of creating "an affirmative power to lease for a specified term, a lease exceeding the term is void at law." To say that an instrument is void at law, is to pronounce it as legally non-existent.

The Court of Appeals in the *Matter of Morse, supra,* when it declared a voting trust not within the statute to be void, did not, it is true, announce the principle in connection with a duration problem such as is here involved. The statement was one expressing the court's general view of the effect the statute has upon the legality of voting trusts under the New York statute. In *Kittinger v. Churchill Evangelistic Ass'n.,* 151 *Misc.* 350, 271 *N. Y. S.* 510, affirmed 244 *App. Div.* 876, 281 *N. Y. S.* 680, the effect which an excess of permitted duration of a voting trust has upon its validity, was before the Supreme Court of New York. Though it was apparently not absolutely necessary for the court, in order to decide the case, to say that a voting trust whose duration was for a longer period than that allowed

by the statute, is void, yet the court did express its opinion that such a trust would be void because of its excessive life. Had the trust instrument created what was in effect a twenty year voting trust, the court said it would have been invalid under the statute.

These two New York cases are the only reported cases which bear on the question involved here. While it may be said that their language is dictum so far as the immediate point of the instant case is concerned, yet it directly bears upon it, and I am disposed to accept it. The statute is quite plain in its limitation of time allowable for a lawful voting trust. In view of the pronounced disfavor in which voting trusts were first held by the courts, and later, when they were looked upon in some jurisdictions with indulgence, in view of the limitations with which they were hedged about, I do not see why the courts should be liberal in construing a statute which, as ours seems to me to do, lays down for them the law of their life. Such appears to be the judicial attitude in New York. The provisions of our statute governing voting trusts are mandatory. *In re Public Industrials Corporation,* 19 *Del. Ch.* 398, reported also as *In re Chilson,* 168 *A.* 82.

Some mention was made at the argument of a construction put upon the voting trust by the trustees, declaring it to have only a ten year life. The trustees are given power to construe the agreement. So, the demurrant contends, the agreement must be taken as one which ends on April 1, 1940, instead of one year later. Whether the so-called construction by the trustees was properly a construction, or whether in contradistinction it was a reformation, or alteration, I do not stop to consider. The bill which supplies all the facts on demurrer, makes no mention of the act of the trustees in attempting to construe the agreement. The court therefore can take no notice of it in disposing of the demurrer.

3. The demurrer raises a question as to parties. The objection is made that none of the holders of voting trust certificates is joined as a party defendant. It is contended that the holders of the voting trust certificates or some one or more of them are necessary parties defendant.

There are 782,027 of the "B" shares deposited in the trust. Presumably, the number of persons holding certificates is a very large one. Certainly to require all of them to be joined as defendants would be beyond all reason, even if they were known. Nor can I see any reason why any of them should be joined as defendants. The trustees are all made parties and may well be regarded, in such a case as this, to represent the trust and to do all that is necessary to sustain its continuance. While of course they are not a corporation, yet in this matter of representation of the equitable owners, practical considerations and the convenient progress of litigation, would suggest that in defense of a suit which attacks the trust, the complainant should be allowed to regard them as the representatives of the equitable owners, as a corporation is looked to in a suit against it as the representative of its body of stockholders. This is especially so when, as here, the depositing stockholders have conferred on the trustees a power at any time after the trust was formed to declare its termination. It would seem rather unreasonable to hold that trustees who have been vested with a power to commit the certificate holders to a termination at any time, could not be fairly representative of the certificate holders when an effort is made to compel them to recognize a termination.

The complainant is representative of a numerous class. As such he is not required to join others of his class with himself as complainant. *Rule* 113 of this court.

The case of *Frost, et al., v. Carse*, 91 *N. J. Eq.* 52, 108 *A.* 641, decided by Lane, V. C., is cited by the demurrant in support of the contention that certificate holders other

than the complainant should be joined as parties. That case was one where one co-trustee sued to oust another. No beneficiary of the trust was a party either as complainant or as defendant. The Vice Chancellor refused to say that it was absolutely necessary to bring in certificate holders as parties. He expressed the opinion that it would be wise to do so, in order that the character of *res judicata* might attach to the final decree. How many certificate holders should have been made parties in order to satisfy the suggestion? The Vice Chancellor answered this question by saying—"one or two." Here we have one, the complainant, who sues on behalf of himself and all other certificate holders. That is enough at least to maintain the suit.

4. It is objected further that paragraph ten of the bill is too vague and indefinite and insufficient in respect of any statement of fact to enable the defendant to make answer thereto. The paragraph in question recites the purpose of the trust to have been to promote the success and best interests of the corporation, etc., and alleges that the declared purpose has utterly failed as is evidenced by the fact that the corporation became insolvent, receivers were appointed for it and its president and directors, including Parish, one of the voting trustees, were subjected to suit for alleged dissipation and loss of the corporation's assets. How the unfortunate experience of the corporation was due to the voting trust is not alleged. The corporation is now solvent and its assets are soon to be restored to it. Failure of purpose of the trust cannot be demonstrated by a bare allegation that the corporation's affairs met with misfortune. The paragraph in question should be more specific before the demurrant is required to make answer. If it is left in its present vague form, I suppose the demurrant would feel required to review in his answer the entire story of the many circumstances and difficulties which, in his view, are explanatory of the corporation's misfortune, to the end that he might demonstrate that there was no causal connection

between the trust and the misfortunes whereby the existence of the trust may be said to be utterly inharmonious with its purposes. The demurrant is entitled to be relieved of answering in such a wide and comprehensive manner.

5. Complaint is made by the demurrant against paragraph eleven of the bill. That paragraph charges that the voting trust was in its creation and is in its operation, hard, unfair and inequitable, in that it deprives the company of the benefit of managing its own interests through its real owners and was created for the purpose of permitting the officers of the company to maintain control without large stock ownership.

The charge thus made by the eleventh paragraph sounds in part like the epitomized reasons which were given by the earlier cases for holding all voting trusts void as against public policy. In view of our statute legalizing voting trusts for a limited period, the allegations of the paragraph are of no material relevancy to the complainant's case. The parties to a voting trust may agree upon what terms they please, so long as the purpose is not one that the law deems to be illegal. *Chandler v. Bellanca Aircraft Corporation, et al.,* 19 *Del. Ch.* 57, 162 *A.* 63. The purpose is not an illegal one which seeks to divorce control from ownership. Indeed a divorce of that character is what voting trusts are specifically devised to accomplish. The demurrer to that part of the bill contained in the eleventh paragraph is well taken.

6. Paragraphs eighteen and nineteen are demurred to because they state mere conclusions of the pleader. They do state conclusions. The one stated in paragraph eighteen is evidently based on preceding facts which the bill recites. It does not, therefore, appear objectionable on the score of its containing a conclusion of the pleader.

Paragraph nineteen, however, appears to state a con-

clusion for which no adequate basis of fact appears anywhere in the bill as a predicate. It simply states that the ballot attempted to be cast by Parish and White is the result of collusion between Parish, White and Crandall. Of course Parish and White, being voting trustees, have a right to join in an agreement as to how the stock in the trust should be voted. Such an agreement is contemplated by the trust provisions. In itself, it can in no sense be called a collusion, a term which connotes an agreement infected with some improper or immoral purpose. The only fact which connects Crandall with the so-called collusion, if it can be called a fact, is deducible from a brief recitation of facts found in paragraph seventeen from which a suspiciously disposed mind may infer corruption in connection with the designation by Crandall of White as successor trustee. The bill, however, makes no direct charge of that character. It appears to me studiously to refrain from doing so. If the complainant is unwilling to make an allegation of corruption, based on the brief facts he discloses in paragraph seventeen, facts which are entirely capable of an innocent interpretation, he has no right to expect the court to infer that which he is unwilling to charge.

Paragraph nineteen is open to objection and the demurrer thereto should be sustained.

I may say in conclusion that as the sole relief prayed for in this bill is on the theory that the trust is void, I do not see the pertinency to the case of the allegations contained in paragraphs ten, eighteen and nineteen, to which the demurrer was specially directed. The demurrant, however, attacked those paragraphs only on the ground of their vagueness and indefiniteness.

The demurrer will be overruled in part and sustained in part as indicated in the foregoing.

Order accordingly.