Byron D. FOYE, Dudley L. Miller, Mandeville Mullally, Bayard F. Pope and Winthrop A. Short, individually and as voting trustees of the stock of Howes Leather Company, Inc., a Delaware corporation, Defendants Below, Appellants,

v.

NEW YORK UNIVERSITY, Plaintiff Below, Appellee.

Supreme Court of Delaware.

May 20, 1970.

Reargument Denied July 13, 1970.

Edmund N. Carpenter, II, and David T. Dana, III, of Richards, Layton & Finger, Wilmington, for defendants below, appellants.

S. Samuel Arsht, Walter K. Stapleton and Lewis S. Black, Jr., of Morris, Nichols, Arsht & Tunnell, Wilmington, and Lord, Day & Lord, New York City, for plaintiff below, appellee.

WOLCOTT, C. J., and CAREY and HERMANN, JJ., sitting.

HERRMANN, Justice:

This appeal involves the validity of an extension of a voting trust agreement. The Court of Chancery granted summary judgment in favor of the plaintiff New York University (hereinafter "N.Y.U."), holding that the extension here attempted was invalid under 8 Del.C. § 218(b).[1]

1. This case is governed by the Delaware Corporation Law prior to its amendment in 1967. 8 Del.C. § 218 (repealed by 56 Del.L. Ch. 50, § 1, eff. July 3, 1967) provided in pertinent part, by sub-paragraph (a), that one or more stockholders by written agreement could enter into a voting trust of capital stock of a Delaware corporation, upon such terms as are stated in the agreement and for a period of time not exeeding 10 years.

Subsection (b) of § 218 provided:

"(b) At any time within one year prior to the time of expiration of any such voting trust agreement as originally fixed or as extended as herein provided, one or more beneficiaries of the trust under such voting trust agreement may,

## I.

Except as noted herein, the following facts appear to be undisputed:

In 1945, N.Y.U.'s College of Medicine was engaged in a fund-raising campaign. A prominent alumnus of the University's School of Law, upon being approached for a contribution, suggested a solution to the University's chronic financial problems: take advantage of a United States Supreme Court decision, he suggested, holding tax exempt any funds ultimately destined for the exclusive benefit of an exempt charitable organization, by acquiring going businesses and having them operated for the University's benefit. Such situation, it was suggested, would be attractive to certain owners interested in selling their businesses because, *inter alia,* the purchase price could be paid in installments out of the tax-exempt company's earnings much more quickly than might otherwise be the case.

The suggestion was passed along to officers of N.Y.U. who, in turn, referred the idea to John Gerdes, Esquire, general counsel for N.Y.U. After due consideration of the matter, Gerdes recommended that N.Y.U. embark upon a program along the lines suggested; and he advised the organizing of Delaware stock corporations for charitable purposes, all the profits of which would inure to N.Y.U. Gerdes' recommendations were accepted by N.Y.U. and he was authorized to proceed with the course of action outlined. It was understood that the control of the corporations to be organized would be held by persons closely associated with N.Y.U. whose only interest would be its benefit and welfare.[2] The University, itself, would not manage the corporations because it did not choose to become involved in possible labor disputes, debt involvements, and other market-place problems.

In 1945, pursuant to N.Y.U.'s authorization, Gerdes organized Medlaw Corporation, a Delaware corporation which was to become the prototype of the corporations organized to take advantage of N.Y.U.'s income tax exemption. The certificate of incorporation provided that it was organized exclusively for the benefit of the College of Medicine and the School of Law of N.Y.U. In addition to Gerdes, the five other incorporators, stockholders, and directors of Medlaw Corporation were all closely related to N.Y.U.: the dean of the Law School, the acting dean of the College of Medicine, a professor, and members of the Board of Trustees of the University. The ten shares of Medlaw stock were paid for by, and the stock was issued to, the six incorporators at a nominal consideration. Almost simultaneously, the six stockholders entered into a voting trust agreement with themselves, under which they became the voting trustees.

Medlaw received a ruling from the Internal Revenue Service that it was exempt from Federal income taxation so long as it acted within the scope of its certificate of incorporation. Medlaw then purchased the stock of Ramsey Accessories Manufacturing, a closely held corporation engaged in the piston ring business.

The Medlaw-Ramsey transaction received wide-spread publicity. Thereafter, N.Y.U.

by agreement in writing and with the written consent of such voting trustees, extend the duration of such voting trust agreement for an additional period not exceeding ten years. The voting trustees shall, prior to the time of expiration of any such voting trust agreement, as originally fixed or as previously extended, as the case may be, file in the principal office of the corporation in the State of Delaware a copy of such extension agreement and of their consent thereto, and thereupon the duration of such voting trust agreement shall be extended for the period fixed in such extension agreement; but no such extension agreement shall affect the rights or obligations of persons not parties thereto."

The provisions of the present Corporation Law pertaining to extension of voting trusts [also designated 8 Del.C. § 218(b)] are substantially the same, including the word "beneficiaries" herein construed.

2. The fact of such "understanding" is disputed by the appellant voting trustees.

and its general counsel, Gerdes, received a number of offers of proposed sales in that format. Most offers were rejected but, during the period of about three years after the Ramsey acquisition, six additional tax exempt corporations were organized by Gerdes to acquire businesses to be operated for the benefit of N.Y.U. They had charters and voting trusts similar to those used in Medlaw. One of these was Howes Leather Company, Inc., a Delaware corporation (hereinafter "Howes"), the corporation involved in this litigation.[3]

In April 1947, Gerdes received an inquiry as to the possibility of a sale of the stock of Howes' predecessors to a tax-exempt corporation in the Medlaw-Ramsey format. Gerdes negotiated the sale and organized Howes as the tax-exempt purchaser.

Howes' certificate of incorporation followed the general lines of the Medlaw charter and the charters of the other five corporations being organized by Gerdes at about the same time. In particular, it provided:

"THIRD: This corporation is organized exclusively for charitable, scientific, literary and/or educational purposes and no part of its income or property shall inure to the private benefit of any stockholder, director, or officer, or to the benefit of any individual or corporation other than New York University."

"NINTH: * * * (h) No stockholder shall at any time be entitled to dividends on his shares; nor shall he at any time be entitled to any of the profits or assets of * * * [Howes]. In the event of the liquidation, dissolution, or winding up of * * * [Howes], the directors * * * shall, after payment of all creditors, distribute the assets of the Foundation to New York University."

The incorporators and original subscribers of Howes were Gerdes, Dudley L. Miller and Winthrop A. Short. Both Miller and Short were sons-in-law of Gerdes and associates in his law firm. All three, from time to time, were counsel for N.Y.U. They paid $1,000. jointly for the stock of Howes and considered it a contribution to the University. Shortly thereafter, Gerdes and Miller entered into a voting trust agreement with themselves and with Joseph A. Broderick, Paul H. Hudson, Warner W. Kent, Richard W. Lawrence, and Bayard F. Pope. The latter, except Kent, were all trustees of N.Y.U.; and Kent was the nephew of the President of its Board of Trustees.

The preamble of the voting trust agreement recited that Howes was organized for the exclusive purpose of benefiting N.Y.U.; that the stockholders "have acquired their shares only to further the purposes of Howes Leather Company, Inc., and not for their own private gain"; and that the purpose of the voting trust is to "better accomplish" the purposes for which the corporation was organized. There then followed ordinary provisions for surrender of stock certificates and registration in the name of voting trustees, continuation of the trust for a term of ten years, and delegation of voting rights to the trustees. The voting trust agreement then provided:

"4. Each individual Trustee designated in this agreement or acting as successor to a designated trustee, and each person depositing shares under this agreement or succeeding him as beneficial owner of deposited shares, shall continue as such Trustee and as such owner of a beneficial interest in the shares, only so long as he remains a director of Howes Leather Company, Inc. If, and when, he ceases to be a director of Howes Leather Company, Inc., for any reason whatsoever, he shall automatically cease to be a trustee hereunder, and shall also automatically cease to have any beneficial interest in any of the shares deposited hereunder. The person elected as his successor on the

3. Another was Knapp Brothers Shoe Manufacturing Corporation, a Delaware corporation (hereinafter "Knapp"), to which reference is made *infra*.

board of directors shall automatically succeed him as trustee hereunder and as owner of his beneficial interest in the shares."

"5. The trustees in office on May 1, 1957, collectively, shall be deemed to have such beneficial interest in the trust and the shares deposited hereunder as will enable a majority of them to extend the duration of this voting trust agreement for such additional period as may be permitted by the laws of Delaware. If extended, this voting trust agreement may be further extended from time to time, if permitted by the laws of Delaware, by action of a majority of the Trustees in office on the first day of May immediately preceding the termination of the extension then in effect."

The agreement further provided: "Upon the termination of this agreement and of the last extension thereof, the shares of stock shall become the property of New York University * * *."

Almost ten years later, in May 1957, the Howes voting trust was extended for an additional ten years by an agreement executed by Gerdes, Miller, Short, Pope and Kent.[4] In the extension agreement, the original voting trust agreement was modified as follows: ·

"If no successor director [of Howes] is elected, the remaining trustees shall continue as the only trustees and the

beneficial owners and holders of the deposited shares."

N.Y.U. made no objection to the 1957 extension of the voting trust. While its counsel Gerdes lived, N.Y.U. was content with the Howes operation. However, after his death in 1959, there followed a chain of events which gave rise to increasing dissatisfaction on the part of N.Y.U.[5] Most significant was the decision of the Howes directors[6] not to fulfill a 1948 resolution to pay over $700,000. to N.Y.U. if Howes should be held exempt from income tax during its first taxable year ending June 30, 1948. In 1960, the Tax Court ruled that Howes was exempt and it received a $4,000,000. refund. Nevertheless, Howes decided not to carry out its 1948 resolution; and in 1962 N.Y.U. received only $250,000. in this connection.[7]

Shortly thereafter, the President and Executive Vice President of N.Y.U. advised Miller, then the senior partner of the Gerdes firm and general counsel of N.Y.U., of the University's desire to modify the Howes voting trust agreement to assure that a majority of the voting trustees would be elected from the Board of Trustees of the University; and to assure that no more than a minority of the voting trustees would come from one law firm. This proposal was held in abeyance, without action, upon Miller's advice.

In 1966, it was learned by N.Y.U. from Howes' regular audit report that Howes

4. Of the original voting trustees: Lawrence died in 1948 and was replaced; Hudson resigned in 1952 and was not replaced; Broderick resigned in 1951 and was replaced by Gerdes' former law associate Short.

5. By the time of Gerdes' death, the complexion of the Howes voting trustees had changed drastically over the years. As has been noted, Broderick, Hudson and Lawrence were no longer trustees. In 1958, Kent died and was succeeded by Elwin D. Knapp, a principal in the Knapp acquisition arranged by Gerdes for the benefit of N.Y.U. Gerdes was succeeded by Mandeville Mullally, Jr., another mem-

ber of the Gerdes law firm. Thus, at this point, none of the Howes voting trustees with the exception of Pope was a trustee of N.Y.U. or otherwise associated with it, except that voting trustees Miller and Mullally were members of the Gerdes firm which remained general counsel to N.Y.U.

6. The Howes board of directors was divided equally between directors elected by bondholders (former owners, their heirs, assigns, and trustees) and by stockholders. Bondholders held a first mortgage on all assets of the company.

7. The appellant voting trustees dispute the fact of N.Y.U.'s "dissatisfaction" as set forth in this paragraph.

had invested large sums of money, during the previous year, to acquire a bird seed company. The University administration was especially troubled by this because of its need for capital funds and its major fund-raising campaign then under way. In March 1967, N.Y.U. requested the opinion of Miller as to its legal rights regarding modification or termination of the voting Howes trust which was due to expire in May 1967. On April 6, Miller advised N.Y.U. that it had no "legal basis for attempting to modify or terminate the voting or charitable trust agreements created by the stockholders and voting trustees." On April 21, N.Y.U.'s President requested Miller to obtain from the voting trustees "a firm commitment" that they would refrain from renewal of the voting trust agreement "except after appropriate discussion of these matters with representatives of the University." No such commitment was forthcoming; and on May 8, without notice to N.Y.U., the five voting trustees who are named defendants in this action [8] signed an agreement purporting to extend the voting trust for another ten years. N.Y.U. was not notified of the extension until June 21. The secrecy was arranged by Miller to prevent N.Y.U. from seeking and "possibly obtaining" an injunction against renewal of the voting trust. The 1967 extension agreement referred to the voting trustees as the "beneficiaries of the charitable trust under that so-called 'voting trust agreement' made October 15, 1947."

At that time, Miller's firm was receiving from Howes the sum of $22,000. and from Knapp the sum of $48,000. as annual retainers; and Short, having left the law firm in 1955 to become president of Knapp, was receiving $60,000. per annum in that capacity.[9]

In July 1967, N.Y.U. terminated the services of Miller's firm as its general counsel; and in September 1967, this action was instituted to have the purported extension of the Howes voting trust declared invalid.

## II.

The Chancery Court disposed of the cause on cross motions for summary judgment. It held that the trustees of the Howes voting trust are not "beneficiaries" within the meaning of 8 Del.C. § 218(b) because they are "expressly excluded from participation in any of the economic benefits of the trusts." The Chancery Court held that N.Y.U. holds the only real beneficial interest, and is the only "beneficiary" under § 218(b), because it alone will receive the net profits of the business and the stock itself upon the termination of the voting trust. The Chancery Court concluded that since only "one or more beneficiaries" within the meaning of § 218(b) could extend the voting trust, and since N.Y.U. had not taken the required action under the Statute, the 1967 purported extension was contrary to law and invalid. Accordingly, the Chancery Court entered judgment declaring the voting trust terminated and N.Y.U. the owner and holder of "the entire and only beneficial interest in the outstanding shares of stock of Howes Leather Company, Inc."

## III.

We cannot agree with the Chancery Court's construction of the word "beneficiaries" as used in § 218(b).

■■■ The word "beneficiaries" in § 218 (b) refers, we think, to the stockholder-creators of a voting trust. The terminology of voting trusts is not necessarily the terminology of ordinary property trusts. Conventional trust terminology does not necessarily apply to voting trusts. Hearst v. American Newspapers, Inc. (D.C.Del.

---

8. They are Byron D. Foye (another Knapp officer), Pope, Miller, Short, and Mullally.

9. There is dispute as to whether, before 1967, the incumbent administration of

N.Y.U. knew, or should have known, the facts regarding the retainers and Short's earnings as president of Knapp.

1943) 51 F.Supp. 171. A "beneficiary" of a property trust, generally speaking, is one interested in economic benefits flowing from the property. A "beneficiary" of a voting trust, on the other hand, is the stockholder concerned with, and relieved of, the vote and control of the corporation for purposes that seemed good and sufficient to him when he entered into the voting trust agreement. Otherwise stated, voting trusts and § 218 are concerned with restraints on control of the corporation and not with economic interests therein. This construction of the term "beneficiaries", as used in § 218(b), is impelled by the basic purpose of the voting trust and is in accord with the views expressed by our courts since the term was introduced into the Voting Trust Statute in 1935. See 40 Del. L. Ch. 148; Tracey v. Franklin, 30 Del.Ch. 407, 61 A.2d 780, aff'd. 31 Del.Ch. 477, 67 A.2d 56 (1949); Perry v. Missouri-Kansas Pipe Line Co., 22 Del.Ch. 33, 191 A. 823 (1937); Peyton v. William C. Peyton Corp., 22 Del.Ch. 187, 194 A. 106 (1937).

■ Accordingly, we hold that the stockholder-creators of a voting trust are the "beneficiaries" empowered by § 218(b) to extend the trust. The stockholder-creators of the voting trust in the instant case were Gerdes, Miller, and Wood, their successors and assigns. It follows that the judgment of the Chancery Court, based upon a conflicting premise, must be reversed.

## IV.

But this conclusion does not end the matter before us.

N.Y.U. contended below, and now contends here, that Gerdes, Miller, and Short acted as the attorneys and agents of N.Y.U. when they formed Howes, became its initial stockholders, and created the voting trust. It is contended that they, as well as the University trustees who were their initial colleagues in the transaction and all their successors and assigns including the incumbents, acted in the capacity of agents and fiduciaries for N.Y.U. It is further argued that, as such agents and fiduciaries, the stockholder-trustees owed to N.Y.U. the duties of loyalty, good faith, and obedience to all reasonable instructions in the performance of any function within the scope of the agency. The argument then goes that the secret 1967 attempt to extend the voting trust, in violation of the explicit instructions of N.Y.U., constituted a violation of such duties and, therefore, must be deemed invalid as to it.

This issue of agency, although presented below, was not decided by the Chancery Court; under the approach taken by the Chancery Court, the agency question was not reached.

■ In view of our above ruling on the construction of the Voting Trust Statute, however, the agency question thus tendered by N.Y.U. must be resolved. But we are of the opinion that the issue may not be determined at the summary judgment stage. There appear to be genuine issues of material fact as to the agency question sufficient to require the trial thereof:

For example, as a controverted factual issue, it must be decided whether Gerdes and the two members of his law firm, Miller and Short, were acting as counsel and agents for N.Y.U. in the negotiations and activities surrounding the purchase of the stock of Howes' predecessors, the organization of Howes as the tax-exempt purchaser, and the creation of the voting trust; or whether they were acting individually and independently in these matters as "interested alumni". There is evidence to show that the original $1,000. paid in by Gerdes, Miller, and Short for the stock of Howes was considered a contribution to N.Y.U.; and that the original stockholder-trustee group organized by Gerdes were all trustees of N.Y.U. (except the nephew of the president of its board of trustees), who occupied positions of fiduciary responsibility to the University and

were nominees selected by N.Y.U. to represent N.Y.U. and its interests. On the other hand, there is evidence to show that the original stockholder-trustees acted independently as "interested alumni".

Moreover, there is evidence from which it may be found that, its wish to be insulated later from the market place notwithstanding, N.Y.U. used its people and resources in actually guiding and directing the activities of its attorneys, trustees, faculty, and alumni in the creation of Howes as a tax-exempt corporation, in the acquisition of the business for its benefit, and in the creation of the voting trust. There is evidence from which it may be found that the Howes transaction was a "corporate opportunity" of N.Y.U. which its representatives in the matter could not properly divert to themselves; that the stockholder-trustees acquired no interest in their individual capacities, any interest acquired by them being acquired in the course of their agency relationship. On the other hand, there is evidence from which it may be found that N.Y.U. actually divorced itself from the creation of this trust and had no voice in the activities relative thereto which were carried on independently by its friends on its behalf.

These and other fact issues must be tried and the issue of agency thus resolved.

If it is determined that the stockholder-trustees were agents and fiduciaries of N.Y.U., the Chancery Court will then reach the collateral questions raised by N.Y.U.: that N.Y.U., as principal for which the ostensible settlors acted, is the true settlor; and that as the sole settlor and sole beneficiary, N.Y.U. has the unrestricted right and power to terminate the trust. We do not reach those questions in the disposition of this appeal.

## V.

We are required, however, to dispose of several other contentions raised by the parties:

■ 1) The trustees contend that N.Y. U. is barred, by laches, waiver, or estoppel from challenging the 1967 extension of the voting trust; this because N.Y.U. disclaimed control over the trust for twenty years and, for ten years, accepted the benefits of an identical extension of the trust made without its consent. We hold this contention to be without merit because if N.Y.U. has a right, it is a continuing right. The Vice Chancellor stated, and we agree, that since the right being asserted is a continuing one, N.Y.U.'s failure to challenge the 1957 extension did not preclude it from an admittedly timely assertion of the invalidity of the 1967 extension. Compare Most Worshipful Prince Hall Grand Lodge of Free and Accepted Masons of Delaware v. Hiram G. Lodge, 32 Del.Ch. 85, 80 A.2d 294 (1951).

■ 2) The trustees contend that a voting trust under 8 Del.C. § 218 was not intended here at all; that, actually, the intent of the stockholders was to create a perpetual charitable trust as an endowment fund for N.Y.U., with no right in N.Y.U. to terminate the trust. We cannot disregard the clear and unequivocal action taken by the stockholders in creating a voting trust, with explicit reference to the Voting Trust provisions of the Delaware Corporation Law. The entire record before us supports the conclusion that a voting trust, subject to the provisions of § 218, was intended and was accomplished. The trustees are probably correct in their assertion that the drafters of § 218 never contemplated its use for the purpose to which it was here put; but, unquestionably, the stockholder-trustees intended the use to which they put § 218 and intended to adopt its machinery to their needs and wishes of the moment. The trust was a creature of § 218; it must remain such.

■ 3) N.Y.U. contends that, in any event, the voting trust was not extended validly, either in 1957 or 1967, because (a) the persons who authorized the 1957 exten-

sion were not the holders of all the "beneficial interest"; and (b) the voting trust terms were amended both in 1957 and 1967. Insofar as these contentions relate to the 1957 extension, the bar of the affirmative defense of laches, waiver, and estoppel applies. As to the 1967 extension, the short answer is that the changes in the voting trust were approved both by the creators of the trust and the "beneficiaries" thereof, under our construction of that term as used in § 218. Unless they were agents and fiduciaries of N.Y.U., acting in violation of their duty of obedience and loyalty, the stockholder-trustees were empowered to make the changes here involved; and in view of the specific nature of the changes made, they were not so prejudicial to N.Y.U.'s status as remainderman to give it standing to object thereto. Thus, we return to the issue of agency for the trial of which we remand the cause.

\* \* \*

Accordingly, the judgment below is reversed and the cause remanded for further proceedings not inconsistent herewith.

## UPON MOTION FOR REARGUMENT
### (July 10, 1970)

The voting trustees have moved for reargument, asserting error in our references to certain facts as being undisputed. We have made changes in the foregoing Opinion to reflect more accurately the position of the trustees as to factual matters thus called to our attention.

N.Y.U. has also moved for reargument on several grounds:

We are asked to grant reargument on the meaning of "beneficiaries" of a voting trust under 8 Del.C. § 218(b), and on N.Y.U.'s status as such. After due consideration of the motion, we have concluded that nothing more will be heard or said by us on that question in this case.

Something more should be said, however, about two contentions of N.Y.U. which we understood were addressed to the 1957 extension of the voting trust only, but which we now understand to be addressed to the 1967 extension also:

█ 1) N.Y.U. argues that the provisions of Paragraph 4 of the Voting Trust for the succession of beneficial interests violated the rule against perpetuities; that, therefore, the beneficial interest held by Gerdes as one of the two original stockholder-creators of the voting trust is vested in N.Y.U. by reason of the consequent failure of the intervening interests and the consequent acceleration of N.Y.U.'s remainder upon the death of Gerdes. It follows, says N.Y.U., that the holders of all the beneficial interests in the stock did not consent to the 1967 extension.

Assuming, arguendo, the applicability of the rule against perpetuities, the fallacy of this contention lies in Paragraph 5 of the Voting Trust Agreement and in the 1957 Amendment thereto, both of which are set forth above. Paragraph 5 provided that the trustees in office in 1957, "collectively, shall be deemed to have such beneficial interest in the trust and the shares deposited hereunder as will enable a majority of them to extend the duration of this voting trust agreement." The 1957 Amendment provided that if no successor director is elected, "the remaining trustees shall continue as the only trustees and the beneficial owners and holders of the deposited shares." As we have held, the 1957 Amendment is binding upon N.Y.U.

We think it clear from these provisions, when read in the light of Paragraph 4 of the Voting Trust Agreement, that the beneficial interest held by Gerdes passed to the voting trustees or their survivors, collectively and as a group, to be shared by them with any successor trustee who shall have become such by virtue of election to the board of directors of Howes. The contention of N.Y.U. in this regard assumes an attempt to vest the beneficial interest held by Gerdes in a successor, directly and individually, rather than via

the trustees and their survivors, collectively and as a group. This is not the situation under the controlling documents.

2) The other contention of N.Y.U. upon which it requests an explicit ruling is this: The individuals who authorized the 1967 extension did not hold all the beneficial interests. The argument here, closely related to the one immediately foregoing, is premised upon the contention that no director-trustee was elected to succeed original trustee Lawrence on his death, or Hudson on his resignation; that, therefore, the beneficial interest held by each in the deposited shares passed either to N.Y.U. by acceleration or to the heirs of Gerdes by reversion; that, in either case, those who purported to extend the voting trust agreement in 1967 did not possess all the necessary beneficial interests.

Again, we think the fallacy of the contention is obvious. The point is determined by our conclusion that, under the controlling documents, the beneficial interest held by Gerdes passed to the voting trustees and their survivors, collectively and as a group, and not to any individual trustee.

With this addendum, the motions for reargument are denied.