RINGLING BROS.-BARNUM & BAILEY COMBINED SHOWS INC., a Corporation of the State of Delaware, JAMES A. HALEY, AUBREY B. HALEY, JOHN RINGLING NORTH, JAMES R. GRIFFITH and GEORGE WOODS,

Defendants Below, Appellants,

*vs.*

EDITH CONWAY RINGLING,

Complainant Below, Appellee.

*Supreme Court, On Appeal, May 3, 1947.*

RICHARDS, C. J., SPEAKMAN, TERRY, CAREY, and PEARSON, JJ., sitting.

*Aaron Finger*, of the firm of Richards, Layton & Finger, and *Leonard G. Bisco, George B. Balamut* and *William J. Granger*, of the firm of Newman & Bisco, of New York City, for appellants.

*Clair J. Killoran, John Van Brunt, Jr., and F. William Carr*, of the firm of Killoran & Van Brunt, and *Dan Gordon Judge* and *John F. Reddy, Jr.*, of the firm of Engel, Judge & Miller, of New York City, for appellee.

PEARSON, J., delivering the opinion of the court:

The Court of Chancery was called upon to review an attempted election of directors at the 1946 annual stock-

holders meeting of the corporate defendant. The pivotal questions concern an agreement between two of the three present stockholders, and particularly the effect of this agreement with relation to the exercise of voting rights by these two stockholders. At the time of the meeting, the corporation had outstanding 1000 shares of capital stock held as follows: 315 by petitioner Edith Conway Ringling; 315 by defendant Aubrey B. Ringling Haley (individually or as executrix and legatee of a deceased husband); and 370 by defendant John Ringling North. The purpose of the meeting was to elect the entire board of seven directors. The shares could be voted cumulatively. Mrs. Ringling asserts that by virtue of the operation of an agreement between her and Mrs. Haley, the latter was bound to vote her shares for an adjournment of the meeting, or in the alternative, for a certain slate of directors. Mrs. Haley contends that she was not so bound for reason that the agreement was invalid, or at least revocable.

The two ladies entered into the agreement in 1941. It makes like provisions concerning stock of the corporate defendant and of another corporation, but in this case, we are concerned solely with the agreement as it affects the voting of stock of the corporate defendant. The agreement recites that each party was the owner "subject only to possible claims of creditors of the estates of Charles Ringling and Richard Ringling, respectively" (deceased husbands of the parties), of 300 shares of the capital stock of the defendant corporation; that in 1938 these shares had been deposited under a voting trust agreement which would terminate in 1947, or earlier, upon the elimination of certain liability of the corporation; that each party also owned 15 shares individually; that the parties had "entered into an agreement in April 1934 providing for joint action by them in matters affecting their ownership of stock and interest in" the corporate defendant; that the parties desired "to continue to act jointly in all matters relating to their stock ownership or interest in" the corporate defendant (and the

other corporation). The agreement then provides as follows:

"Now, Therefore, in consideration of the mutual covenants and agreements hereinafter contained the parties hereto agree as follows:

"1. Neither party will sell any shares of stock or any voting trust certificates in either of said corporations to any other person whosoever, without first making a written offer to the other party hereto of all of the shares or voting trust certificates proposed to be sold, for the same price and upon the same terms and conditions as in such proposed sale, and allowing such other party a time of not less than 180 days from the date of such written offer within which to accept same.

"2. In exercising any voting rights to which either party may be entitled by virtue of ownership of stock or voting trust certificates held by them in either of said corporation, each party will consult and confer with the other and the parties will act jointly in exercising such voting rights in accordance with such agreement as they may reach with respect to any matter calling for the exercise of such voting rights.

"3. In the event the parties fail to agree with respect to any matter covered by paragraph 2 above, the question in disagreement shall be submitted for arbitration to Karl D. Loos, of Washington, D. C. as arbitrator and his decision thereon shall be binding upon the parties hereto. Such arbitration shall be exercised to the end of assuring for the respective corporations good management and such participating therein by the members of the Ringling family as the experience, capacity and ability of each may warrant. The parties may at any time by written agreement designate any other individual to act as arbitrator in lieu of said Loos.

"4. Each of the parties hereto will enter into and execute such voting trust agreement or agreements and such other instruments as, from time to time they may deem advisable and as they may be advised by counsel are appropriate to effectuate the purposes and objects of this agreement.

"5. This agreement shall be in effect from the date hereof and shall continue in effect for a period of ten years unless sooner terminated by mutual agreement in writing by the parties hereto.

"6 The agreement of April 1934 is hereby terminated.

"7. This agreement shall be binding upon and inure to the benefit of the heirs, executors, administrators and assigns of the parties hereto respectively."

The Mr. Loos mentioned in the agreement is an attorney and has represented both parties since 1937, and, before and after the voting trust was terminated in late 1942, advised them with respect to the exercise of their voting rights. At the annual meetings in 1943 and the two following years, the parties voted their shares in accordance with mutual understandings arrived at as a result of discussions. In each of these years, they elected five of the seven directors. Mrs. Ringling and Mrs. Haley each had sufficient votes, independently of the other, to elect two of the seven directors. By both voting for an additional candidate, they could be sure of his election regardless of how Mr. North, the remaining stockholder, might vote.[1]

Some weeks before the 1946 meeting, they discussed with Mr. Loos the matter of voting for directors. They were in accord that Mrs. Ringling should cast sufficient votes to elect herself and her son; and that Mrs. Haley should elect herself and her husband; but they did not agree upon a fifth director. The day before the meeting, the discussions were continued, Mrs. Haley being represented by her husband since she could not be present because of illness. In a conversation with Mr. Loos, Mr. Haley indicated that he would make a motion for an adjournment of the meeting for sixty days, in order to give the ladies additional time to come to an agreement about their voting. On the morning of the meeting, however, he stated that because of something

---

[1] Each lady was entitled to cast 2205 votes (since each had the cumulative voting rights of 315 shares, and there were 7 vacancies in the directorate). The sum of the votes of both is 4410, which is sufficient to allow 882 votes for each of 5 persons. Mr. North, holding 370 shares, was entitled to cast 2590 votes, which obviously cannot be divided so as to give to more than two candidates as many as 882 votes each. It will be observed that in order for Mrs. Ringling and Mrs. Haley to be sure to elect five directors (regardless of how Mr. North might vote) they must act together in the sense that their combined votes must be divided among five different candidates and at least one of the five must be voted for by both Mrs. Ringling and Mrs. Haley.

Mrs. Ringling had done, he would not consent to a post-ponement. Mrs. Ringling then made a demand upon Mr. Loos to act under the third paragraph of the agreement "to arbitrate the disagreement" between her and Mrs. Haley in connection with the manner in which the stock of the two ladies should be voted. At the opening of the meeting, Mr. Loos read the written demand and stated that he determined and directed that the stock of both ladies be voted for an adjournment of sixty days. Mrs. Ringling then made a motion for adjournment and voted for it. Mr. Haley, as proxy for his wife, and Mr. North voted against the motion. Mrs. Ringling (herself or through her attorney, it is immaterial which,) objected to the voting of Mrs. Haley's stock in any manner other than in accordance with Mr. Loos' direction. The chairman ruled that the stock could not be voted contrary to such direction, and declared the motion for adjournment had carried. Nevertheless, the meeting proceeded to the election of directors. Mrs. Ringling stated that she would continue in the meeting "but without prejudice to her position with respect to the voting of the stock and the fact that adjournment had not been taken." Mr. Loos directed Mrs. Ringling to cast her votes

    882 for Mrs. Ringling,

    882 for her son, Robert, and

    441 for a Mr. Dunn,

who had been a member of the board for several years. She complied. Mr. Loos directed that Mrs. Haley's votes be cast

    882 for Mrs. Haley,

    882 for Mr. Haley, and

    441 for Mr. Dunn.

Instead of complying, Mr. Haley attempted to vote his wife's shares

    1103 for Mrs. Haley, and

    1102 for Mr. Haley.

Mr. North voted his shares

    864 for a Mr. Woods,

    863 for a Mr. Griffin, and

    863 for Mr. North.

The chairman ruled that the five candidates proposed by Mr. Loos, together with Messrs. Woods and North, were elected. The Haley-North group disputed this ruling, insofar as it declared the election of Mr. Dunn; and insisted that Mr. Griffin, instead, had been elected. A directors' meeting followed in which Mrs. Ringling participated after stating that she would do so "without prejudice to her position that the stockholders' meeting had been adjourned and that the directors' meeting was not properly held." Mr. Dunn and Mr. Griffin, although each was challenged by an opposing faction, attempted to join in voting as directors for different slates of officers. Soon after the meeting, Mrs. Ringling instituted this proceeding.

The Vice-Chancellor determined that the agreement to vote in accordance with the direction of Mr. Loos was valid as a "stock pooling agreement" with lawful objects and purposes, and that it was not in violation of any public policy of this state. He held that where the arbitrator acts under the agreement and one party refuses to comply with his direction, "the Agreement constitutes the willing party * * * an implied agent possessing the irrevocable proxy of the recalcitrant party for the purpose of casting the particular vote." It was ordered that a new election be held before a master, with the direction that the master should recognize and give effect to the agreement if its terms were properly invoked.

Before taking up defendants' objections to the agreement, let us analyze particularly what it attempts to provide with respect to voting, including what functions and powers it attempts to repose in Mr. Loos, the "arbitrator". The agreement recites that the parties desired "to continue to act jointly in all matters relating to their stock ownership or interest in" the corporation. The parties agreed to consult and confer with each other in exercising their voting rights and to act jointly—that is, concertedly; unitedly; towards unified courses of action—in accordance with such agreement as they might reach. Thus, so long as the parties

agree for whom or for what their shares shall be voted, the agreement provides no function for the arbitrator. His role is limited to situations where the parties fail to agree upon a course of action. In such cases, the agreement directs that "the question in disagreement shall be submitted for arbitration" to Mr. Loos "as arbitrator and his decision thereon shall be binding upon the parties." These provisions are designed to operate in aid of what appears to be a primary purpose of the parties, "to act jointly" in exercising their voting rights, by providing a means for fixing a course of action whenever they themselves might reach a stalemate.

Should the agreement be interpreted as attempting to empower the arbitrator to carry his directions into effect? Certainly there is no express delegation or grant of power to do so, either by authorizing him to vote the shares or to compel either party to vote them in accordance with his directions. The agreement expresses no other function of the arbitrator than that of deciding questions in disagreement which prevent the effectuation of the purpose "to act jointly." The power to enforce a decision does not seem a necessary or usual incident of such a function. Mr. Loos is not a party to the agreement. It does not contemplate the transfer of any shares or interest in shares to him, or that he should undertake any duties which the parties might compel him to perform. They provided that they might designate any other individual to act instead of Mr. Loos. The agreement does not attempt to make the arbitrator a trustee of an express trust. What the arbitrator is to do is for the benefit of the parties, not for his own benefit. Whether the parties accept or reject his decision is no concern of his, so far as the agreement or the surrounding circumstances reveal. We think the parties sought to bind each other, but to be bound only to each other, and not to empower the arbitrator to enforce decisions he might make.

From this conclusion, it follows necessarily that no decision of the arbitrator could ever be enforced if both

parties to the agreement were unwilling that it be enforced, for the obvious reason that there would be no one to enforce it. Under the agreement, something more is required after the arbitrator has given his decision in order that it should become compulsory; at least one of the parties must determine that such decision shall be carried into effect. Thus, any "control" of the voting of the shares, which is reposed in the arbitrator, is substantially limited in action under the agreement in that it is subject to the overriding power of the parties themselves.

The agreement does not describe the undertaking of each party with respect to a decision of the arbitrator other than to provide that it "shall be binding upon the parties". It seems to us that this language, considered with relation to its context and the situations to which it is applicable, means that each party promised the other to exercise her own voting rights in accordance with the arbitrator's decision. The agreement is silent about any exercise of the voting rights of one party by the other. The language with reference to situations where the parties arrive at an understanding as to voting plainly suggests "action" by each, and "exercising" voting rights by each, rather than by one for the other. There is no intimation that this method should be different where the arbitrator's decision is to be carried into effect. Assuming that a power in each party to exercise the voting rights of the other might be a relatively more effective or convenient means of enforcing a decision of the arbitrator than would be available without the power, this would not justify implying a delegation of the power in the absence of some indication that the parties bargained for that means. The method of voting actually employed by the parties tends to show that they did not construe the agreement as creating powers to vote each other's shares; for at meetings prior to 1946 each party apparently exercised her own voting rights, and at the 1946 meeting, Mrs. Ringling, who wished to enforce the agreement, did not attempt to cast a ballot in exercise of any

voting rights of Mrs. Haley. We do not find enough in the agreement or in the circumstances to justify a construction that either party was empowered to exercise voting rights of the other.

Having examined what the parties sought to provide by the agreement, we come now to defendants' contention that the voting provisions are illegal and revocable. They say that the courts of this state have definitely established the doctrine "that there can be no agreement, or any device whatsoever, by which the voting power of stock of a Delaware corporation may be irrevocably separated from the ownership of the stock, except by an agreement which complies with *Section* 18" of the *Corporation Law, Rev. Code* 1935, § 2050, and except by a proxy coupled with an interest. They rely on *Perry v. Missouri-Kansas P. L. Co.*, 22 *Del. Ch.* 33, 191 *A.* 823; *In re Public Industrials Corporation*, 19 *Del. Ch.* 398, reported as *In re Chilson*, 168 *A.* 82; *Aldridge v. Franco Wyoming Oil Co.*, 24 *Del. Ch.* 126, 7 *A.* 2d 753; affirmed in 24 *Del. Ch.* 349, 14 *A.* 2d 380; *Belle Isle Corporation v. Corcoran, ante p.* 318, 49 *A.* 2d 1; and contend that the doctrine is derived from *Section* 18 itself, *Rev. Code of Del.* 1935, § 2050. The statute reads, in part, as follows:

"Sec. 18. Fiduciary Stockholders; Voting Power of; Voting Trusts:—Persons holding stock in a fiduciary capacity shall be entitled to vote the shares so held, and persons whose stock is pledged shall be entitled to vote, unless in the transfer by the pledgor on the books of the corporation he shall have expressly empowered the pledgee to vote thereon, in which case only the pledgee, or his proxy may represent said stock and vote thereon.

"One or more stockholders may by agreement in writing deposit capital stock of an original issue with or transfer capital stock to any person or persons, or corporation or corporations authorized to act as trustee, for the purpose of vesting in said person or persons, corporation or corporations, who may be designated Voting Trustee or Voting Trustees, the right to vote thereon for any period of time determined by such agreement, not exceeding ten years, upon the terms and conditions stated in such agreement. Such agreement may

contain any other lawful provisions not inconsistent with said purpose. * * * Said Voting Trustees may vote upon the stock so issued or transferred during the period in such agreement specified; stock standing in the names of such Voting Trustees may be voted either in person or by proxy, and in voting said stock, such Voting Trustees shall incur no responsibility as stockholder, trustee or otherwise, except for their own individual malfeasance."[2]

In our view, neither the cases nor the statute sustain the rule for which the defendants contend. Their sweeping formulation would impugn well-recognized means by which a shareholder may effectively confer his voting rights upon others while retaining various other rights. For example, defendants' rule would apparently not permit holders of voting stock to confer upon stockholders of another class, by the device of an amendment of the certificate of incorporation, the exclusive right to vote during periods when dividends are not paid on stock of the latter class. The broad prohibitory meaning which defendants find in *Section* 18 seems inconsistent with their concession that proxies coupled with an interest may be irrevocable, for the statute contains nothing about such proxies. The statute authorizes, among other things, the deposit or transfer of stock in trust for a specified purpose, namely, "vesting" in the transferee "the right to vote thereon" for a limited period; and prescribes numerous requirements in this connection. Accordingly, it seems reasonable to infer that to establish the relationship and accomplish the purpose which the statute authorizes, its requirements must be complied with. But the statute does not purport to deal with agreements whereby shareholders attempt to bind each other as to how they shall vote their shares. Various forms of such pooling agreements, as they are sometimes called, have been held

---

[2] Omitted portions of the section provide requirements for the filing of a copy of the agreement in the principal Delaware office of the corporation for the issuance of certificates of stock to the voting trustees, for the voting of stock where there are more than one voting trustee, and for the extension of the agreement for additional periods, not exceeding ten years each.

valid and have been distinguished from voting trusts. *Smith v. San Francisco & N. P. Ry. Co.,* 115 *Cal.* 584, 47 *P.* 582, 35 *L.R.A.* 309, 56 *Am. St. Rep.* 119; *Brightman v. Bates,* 175 *Mass.* 105, 55 *N.E.* 809; *Trefethen v. Amazeen,* 93 *N. H.* 110, 36 *A.* 2d 266; *Wallace v. Southwestern Sanitarium Co.,* 160 *Kan.* 331, 161 *P.* 2d 129; *Wygod v. Makewell Hats, Inc.,* 265 *App. Div.* 286, 38 *N.Y.S.* 2d 587; 5 *Fletcher, Cyclopedia of Corporations,* § 2064; *Wormser, The Legality of Corporate Voting Trusts and Pooling Agreements,* 18 *Col. Law Rev.* 123; *Annotations* 71 *A.L.R.* 1289. We think the particular agreement before us does not violate *Section* 18 or constitute an attempted evasion of its requirements, and is not illegal for any other reason. Generally speaking, a shareholder may exercise wide liberality of judgment in the matter of voting, and it is not objectionable that his motives may be for personal profit, or determined by whims or caprice, so long as he violates no duty owed his fellow shareholders. *Heil v. Standard G. & E. Co.,* 17 *Del. Ch.* 214, 151 *A.* 303. The ownership of voting stock imposes no legal duty to vote at all. A group of shareholders may, without impropriety, vote their respective shares so as to obtain advantages of concerted action. They may lawfully contract with each other to vote in the future in such way as they, or a majority of their group, from time to time determine. (See authorities listed above.) Reasonable provisions for cases of failure of the group to reach a determination because of an even division in their ranks seem unobjectionable. The provision here for submission to the arbitrator is plainly designed as a deadlock-breaking measure, and the arbitrator's decision cannot be enforced unless at least one of the parties (entitled to cast one-half of their combined votes) is willing that it be enforced. We find the provision reasonable. It does not appear that the agreement enables the parties to take any unlawful advantage of the outside shareholder, or of any other person. It offends no rule of law or public policy of this state of which we are aware.

Legal consideration for the promises of each party is supplied by the mutual promises of the other party. The undertaking to vote in accordance with the arbitrator's decision is a valid contract. The good faith of the arbitrator's action has not been challenged and, indeed, the record indicates that no such challenge could be supported. Accordingly, the failure of Mrs. Haley to exercise her voting rights in accordance with his decision was a breach of her contract. It is no extenuation of the breach that her votes were cast for two of the three candidates directed by the arbitrator. His directions to her were part of a single plan or course of action for the voting of the shares of both parties to the agreement, calculated to utilize an advantage of joint action by them which would bring about the election of an additional director. The actual voting of Mrs. Haley's shares frustrates that plan to such an extent that it should not be treated as a partial performance of her contract.

Throughout their argument, defendants make much of the fact that all votes cast at the meeting were by the registered shareholders. The Court of Chancery may, in a review of an election, reject votes of a registered shareholder where his voting of them is found to be in violation of rights of another person. Compare: *In re Giant Portland Cement Co.*, 26 *Del. Ch.* 32, 21 *A.* 2d 697; *In re Canal Construction Co.*, 21 *Del. Ch.* 155, 182 *A.* 545. It seems to us that upon the application of Mrs. Ringling, the injured party, the votes representing Mrs. Haley's shares should not be counted. Since no infirmity in Mr. North's voting has been demonstrated, his right to recognition of what he did at the meeting should be considered in granting any relief to Mrs. Ringling; for her rights arose under a contract to which Mr. North was not a party. With this in mind, we have concluded that the election should not be declared invalid, but that effect should be given to a rejection of the votes representing Mrs. Haley's shares. No other relief seems appropriate in this proceeding. Mr. North's vote against the motion for adjournment was sufficient to defeat

it. With respect to the election of directors, the return of the inspectors should be corrected to show a rejection of Mrs. Haley's votes, and to declare the election of the six persons for whom Mr. North and Mrs. Ringling voted.

This leaves one vacancy in the directorate. The question of what to do about such a vacancy was not considered by the court below and has not been argued here. For this reason, and because an election of directors at the 1947 annual meeting (which presumably will be held in the near future) may make a determination of the question unimportant, we shall not decide it on this appeal. If a decision of the point appears important to the parties, any of them may apply to raise it in the Court of Chancery, after the mandate of this court is received there.

An order should be entered directing a modification of the order of the Court of Chancery in accordance with this opinion.