JAMES S. ABERCROMBIE, PHILLIPS PETROLEUM COMPANY, a corporation, and SUNRAY OIL CORPORATION, a corporation,
Plaintiffs,

*vs.*

RALPH K. DAVIES, SIGNAL OIL AND GAS COMPANY, a corporation, THE HANCOCK OIL COMPANY, a corporation, THE GLOBE OIL AND REFINING COMPANY, a corporation, LARIO OIL AND GAS COMPANY, a corporation, ASHLAND OIL & REFINING COMPANY, a corporation, DEEP ROCK OIL CORPORATION, a corporation, SAMUEL B. MOSHER, GARTH L. YOUNG, JOHN W. HANCOCK, J. HOWARD MARSHALL, HAROLD A. BLACK, FRANCIS L. JEHLE, REXFORD S. BLAZER, SANFORD M. BURNAM, AMERICAN INDEPENDENT OIL COMPANY, a corporation, and SECURITY FIRST NATIONAL BANK OF LOS ANGELES, CALIFORNIA, a corporation,
Defendants.

*New Castle, January 16, 1956.*

*On Motion for Reargument, April 30, 1956.*

*Supplemental Opinion, June 20, 1956.*

*John J. Morris, Jr.,* of Morris, James, Hitchens & Williams, Wilmington, and *Joseph W. Moore,* of Fouts, Amerman & Moore, Houston, Tex., for plaintiff James S. Abercrombie.

*Robert H. Richards, Jr.,* and *Stephen E. Hamilton, Jr.,* of Richards, Layton & Finger, Wilmington, for plaintiffs Phillips Petroleum Co. and Sunray Oil Corp.

*Richard F. Corroon* and *David F. Anderson,* of Berl, Potter & Anderson, Wilmington, and *Francis M. Shea, Warner W. Gardner* and *Vern Countryman,* of Shea, Greenman, Gardner & McConnaughey, Washington, D. C., for defendants Signal Oil & Gas Co., The Hancock Oil Co., Lario Oil & Gas Co., Ralph K. Davies, The Globe Oil & Refining Co., Samuel B. Mosher, Garth L. Young, John W. Hancock, Harold A. Black, Francis L. Jehle, and J. Howard Marshall.

*William Duffy, Jr.,* Wilmington, for defendant American Independent Oil Co.

Defendants Ashland Oil & Refining Co., Deep Rock Oil Corp., Rexford S. Blazer, Sandford M. Burnam and Security First Nat. Bank, Los Angeles, Cal., failed to appear.

SEITZ, Chancellor: This is the decision on plaintiffs' motion for summary judgment. Plaintiffs' motion asks this Court to declare invalid an agreement between certain stockholders and their agents dealing with corporate stockholder and director action. Plaintiffs are not parties to the agreement which concerns a Delaware corporation of which these plaintiffs are stockholders.

In 1947, a Delaware corporation known as American Independent Oil Company ("American") was organized to exploit a concession for oil and gas in the Kuwait-Saudi Arabian Neutral Zone in the Middle East. The three plaintiffs, James S. Abercrombie, Phillips Petroleum Company and Sunray Oil Corporation (called "Abercrombie", "Phillips", and "Sunray" or "plaintiffs") and seven of the

defendants became the stockholders of American.[1]  Under the Organization Agreement as supplemented, it was contemplated that each stockholder would be allowed to name to the board of directors one director for each 5,000 shares of stock held.  The Certificate of Incorporation provided for cumulative voting.  In line with the amount of stock purchased, one director was named by plaintiff, Abercrombie, four by plaintiff, Phillips and one by plaintiff, Sunray.  Two were named by defendant, Signal, two by defendant, Hancock, one each by defendants, Davies, Globe and Lario, Deep Rock, and Ashland. Allied Oil Company elected one but Allied has since been acquired by Ashland.  Consequently, Ashland now elects two directors.  Reference herein to "defendants" will embrace only Signal, Hancock, Davies, Globe and Lario, and Ashland unless otherwise indicated.

At all times since the organization of American the number of directors has been 15.  At times certain directors have resigned and by unanimous consent of the board the resigning director has been permitted to "name" his successor.  Therefore, at all times the directors of American have been and are those selected by the respective stockholders in proportion to the amount of stock owned by each.

The defendant Davies was elected president of American at the first board meeting and continues as such.

In March 1953, American discovered oil, but expensive exploration work continues.  The stockholders have advanced or guaranteed substantial sums.

On March 30, 1950, certain defendants in this litigation executed a so-called Agents' Agreement ("Agreement").  Plaintiffs were not parties thereto and there is a question as to when some one or more of them first learned of its existence, but I deem that issue immaterial.

The defendants Davies, Signal, Hancock, Globe, Lario and Ashland, who together own a majority of American's outstanding stock,

---

1. The seven defendants who are stockholders are: Ralph K. Davies ("Davies"), The Hancock Oil Company ("Hancock"), Signal Oil and Gas Company ("Signal"), the Globe Oil and Refining Company ("Globe"), Lario Oil and Gas Company ("Lario"), Ashland Oil and Refining Company ("Ashland"), and Deep Rock Oil Corporation ("Deep Rock").

entered into the Agreement with the following designated agents, who are also defendants: W. W. Vandeveer, Davies, Jehle, John W. Hancock, Marshall, Black, Mosher and Young. The agents who signed the Agreement were all acting as directors of American when they signed and "represented" the defendants in accordance with their respective stock ownerships. In fact the agents and directors are the same and each is a ranking officer of the corporate shareholder he represents. The terms of the Agreement are developed herein.

On Dcember 9, 1954, a directors' meeting was held in Chicago at which all directors were present. A resolution was then adopted calling for a special meeting of the board to be held on December 16, for the purpose of considering and taking action, *inter alia,* upon proposed amendments to the by-laws, one of which would authorize the board to remove any officer without cause.

This resolution received the affirmative votes of the six directors "representing" plaintiffs and the director representing Deep Rock. The two directors representing the defendant Ashland also voted for the resolution, although they were parties to the Agreement. The other defendants who were parties to the Agreement opposed the resolution. Without narrating the details it is sufficient to say that the appearing parties to the Agreement there stated that Ashland's directors violated the Agreement when they voted as they did.

Preliminarily, no question is raised as to plaintiffs' rights to attack the validity of the Agreement because they are non-parties.

Defendants devote a substantial portion of their brief to the point that this case cannot be properly decided upon plaintiffs' motion for summary judgment. They first contend that there are material issues of fact. Obviously, if material facts are in issue plaintiffs' motion must be denied. But plaintiffs argue that the Agents' Agreement is invalid on its face as a matter of Delaware Law. How then can it be material to this issue whether the directors in fact discharged their duties properly or otherwise acted in accordance with the trust imposed upon them? Such facts are not material to a disposition of the claim upon which plaintiffs' complaint is founded. I fail to find any dispute as to a material fact.

Defendants also urge that the case cannot properly be decided on the pending motion; that defendants should be allowed to prove facts within plaintiffs' control; and that sound judicial administration requires a denial of the motion. I cannot find any merit to any of these arguments in view of the scope of plaintiffs' complaint. If the Agreement is invalid on its face as a matter of law then these other factors cannot affect the result no matter how worthy are the individuals concerned or how large are the amounts of money involved.

Nor do I see any merit to defendants' argument that plaintiffs have no standing to attack the Agreement because of their unclean hands. If, as defendants say, plaintiffs are seeking to vary some alleged understanding among the founders of American including plaintiffs concerning its future control that does not preclude plaintiffs from showing the illegality of this Agreement. This Agreement was executed by defendants and plaintiffs are not parties. The action by plaintiffs which forms the basis for their alleged unclean hands is thus not related to this Agreement.

Defendants say that plaintiffs do not show that the Agreement has been or will be used and so their complaint should be dismissed as premature. This is an action for a declaratory judgment and there is clearly an actual controversy concerning the validity of the Agreement. Moreover, defendants' directors raised the question of a violation of the Agreement by Ashland's agents in connection with the December directors' meeting. I conclude that under the present facts plaintiffs may attack the legality of the Agreement.

This brings us to a consideration of plaintiffs' contentions. Plaintiffs first urge that the Agreement is invalid because "it deprives the board of directors of their statutory function of management of the business of the corporation", 1) by placing control in a minority of the board or an arbitrator or 2) because under the provisions of the Agreement meetings of the board become a mere sham and the directors are prevented from acting as a board. Plaintiffs also say the Agreement is invalid because it is a voting trust which is illegal for failure to comply with the Delaware Statute governing voting trusts. 8 *Del.C.* § 218.

A consideration of plaintiffs' first argument requires an elaborate statement of the provisions of the Agreement. The stated purpose of the Agreement is found in its Preamble:

"Whereas, the parties do hereby agree and declare that the intent and purpose of this Agreement is to provide a means whereby the parties hereto may initiate or maintain in effect any general policy, plan, or program affecting American Independent Oil Company which said parties should determine to be to their joint benefit, interest and advantage, and to the best interest of all stockholders of American Independent Oil Company, and to that end to elect or retain or replace any officer, executive or employee of said company."

The Agreement provided that the contracting shareholders should deposit with the agents their certificates for shares of American, the certificates to be endorsed or powers executed. The agents were to deliver the certificates and powers to a bank to be selected. The bank was to hold them in escrow. However, they could be withdrawn from escrow at any time upon the signatures of any seven agents— there being eight agents in all. The number of agents was fixed on the assumption that the total number of directors of American was and would remain fifteen. The parties undertook to do everything in their power to keep the number of directors of American at fifteen unless at least seven of the eight agents should otherwise determine.

The Agreement called for an increase in the number of agents to be appointed by each shareholder to conform to the number of directors which each such shareholder was entitled to elect, and to readjust and reapportion the number of agents to conform at all times with the number of directors which each shareholder was entitled to elect. The Agreement provided that "during the term of this Agreement the agents shall have the sole and exclusive voting power of the stock subject to this Agreement".

The Agreement provided that the shareholders should deliver to the agents and keep in effect during the life of the Agreement proxies giving such agents the power to vote the stock at all meetings. It also required the agents to consult with each other and make every

effort to agree on how their votes should be cast. It stated that, "the vote of the agents shall always be exercised as a unit, on any matter on which a vote of the stockholders is called for, as any seven of said agents shall direct and determine". It further provided that in the event the agents did not agree the matter was to be submitted to arbitration in accordance with a procedure set out in the Agreement. In that event the decision of the arbitrator would be binding and all stock was to be voted in accordance with the decision of the disinterested arbitrator. The arbitrator or arbitrators were to have no financial interest in American and were to be selected by the agents in accordance with a procedure set out in the Agreement.

The shareholders undertook to use their best efforts to cause the agents representing the corporate shares to be and remain identical with the persons representing the corporate shareholders on the board of American. The Agreement went on to recite:

> "The Shareholders further agree that Ralph K. Davies shall vote, and that the corporate Shareholders will use their best efforts to cause their representatives on the Board of Directors of American Independent Oil Company to vote to initiate, maintain in effect or discontinue any general policy, plan, or program for the company as determined by the Agents or by any seven thereof, and that in the event of the failure of any such director so to vote all parties hereto will cooperate and act in any legal manner possible to cause any director voting contrary to any such determination by the Agents to resign or be removed and to be replaced upon the Board of Directors of American Independent Oil Company. The shareholders pledge themselves by and through their respective representative (either directors or Agents) to consult and confer with each other and to make every effort to agree upon the initiation or the continuance of any policy, plan, or program proposed for or in effect by said American Independent Oil Company, or upon the election, retention, or replacement of any director, officer or employee thereof. In the event of any failure of any seven of the directors representing the Shareholders so to agree, the dispute, wherever possible to do so, shall be settled by submission to an arbitrator or arbi-

trators appointed in the same manner as in the case of a disagreement between the Agents."

Subject to the provisions of Paragraph 5, each Agent's successor, except Davies', was to be selected by the shareholder he represented. Davies' successor was to be selected by a majority of the remaining agents. Subject to the provisions of the same paragraph, each corporate shareholder reserved the right to remove any of its agents at any time without cause and designate successors with the same powers.

Paragraph 5 provides:

"5. Except as may be assented to by seven of the Agents, in the event of:

"(a) A sale or transfer of all or any part of the stock of American Independent Oil Company now held by any Shareholder party hereto to any person or persons other than the present Shareholder parties hereto; or

"(b) The acquisition of a controlling interest in the stock of any corporate Shareholder party hereto by or for the benefit of any person or corporation other than a Shareholder party hereto (except in connection with a corporate reorganization wherein the ultimate control, ownership or management of such corporate shareholder party is not substantially changed),

then upon the occurrence of either or both of the above events, the Agent or Agents representing the seller or transferor Shareholder under (a) above, or the corporate Shareholder party under (b) above, shall forthwith cease to be Agent or Agents hereunder, and a successor Agent or successor Agents shall be immediately appointed by an instrument in writing signed by a majority of the remaining Agents."

The Agreement was irrevocable for a period of ten years from its date unless (1) seven agents voted to terminate it, or (2) less than 50% of the outstanding shares of American remained subject

to the Agreement (but the agents by unanimous vote could determine otherwise).

The Agreement could be transformed into a formal voting trust upon the written request of seven agents, the persons then acting as agents to become the formal trustees and the shareholders to become the formal beneficiaries. If this happened, it was provided that the provisions relating to director action and meetings should remain in effect.

Let us consider plaintiffs' first argument: Plaintiffs contend that the seven vote rule and arbitration provision render the Agreement invalid. Defendants argue that the provisions of the Agreement are not invalid since they merely tend to preserve control in the hands of the majority stockholders and are absolutely necessary in today's business world. I commence the discussion by pointing out that the plaintiffs do not attack the stockholder aspects of the Agreement but confine their attack under this point to the director problem.

The Delaware Corporation Law, 8 *Del.C.* § 141(*a*), provides that "The business of every corporation organized under the provisions of this chapter shall be managed by a board of directors". While there may be some disagreement as to the full sweep of this provision there can be no doubt that in certain areas the directors rather than the stockholders or others are granted the power by the state to deal with questions of management policy. Compare *Security and Exchange Commission v. Transamerica Corp., D.C.,* 67 *F.Supp.* 326, modified on other grounds, 3 *Cir.,* 163 *F.2d* 511, *certiorari denied* 332 *U.S.* 847, 68 *S.Ct.* 351, 92 *L.Ed.* 418 (only by implication). See *Manson v. Curtis,* 223 *N.Y.* 313, 119 *N.E.* 559; *Lippman v. Kehoe Stenograph Co.,* 11 *Del.Ch.* 80, 95 *A.* 895; *Field v. Carlisle Corp.,* 31 *Del.Ch.* 227, 68 *A.2d* 817; *Hanssen v. Pusey & Jones Co., D.C.,* 276 *F.* 296. This means that our corporation law does not permit actions or agreements by stockholders which would take all power from the board to handle matters of substantial management policy. This is particularly true absent 100% stockholder approval, which is not present here. Compare *Clark v. Dodge,* 269 *N.Y.* 410, 199 *N.E.* 641. Even unanimous stockholder action in this field has

limitations. See *Long Park v. Trenton-New Brunswick Theatres Co., 297 N.Y. 174, 77 N.E.2d 633.*

Defendants seek to make the point that the Agreement is directed only to certain aspects of director action, primarily retention of control in the majority stockholders. The difficulty I have with this contention is that the Agreement purports to cover all matters which might come before the board of directors. A reading of the Preamble and many provisions of the Agreement shows that even in its director-action aspects it is all embracing. The Agreement is therefore invalid if the signing stockholders have by its provisions bound "their" directors in advance to vote on all issues in accordance with the decision reached by at least seven director-agents or an arbitrator. This brings us to an analysis of the Agreement and the Certificate of Incorporation.

Each stockholder who signed the Agreement has director representation by virtue of the cumulative voting provision of the Certificate of Incorporation. The Certificate also contains a preemptive rights provision.

The Agreement is made between the stockholders on one side and their respective agents on the other. It became operative when the holders of 50% of the shares executed it. The number of agents is "geared in" with the number of directors, present and future, of American. Each signing shareholder agreed to try to see that at all times his agents should be the same persons as the directors representing that stockholder on the board. During the period of the Agreement (10 years) the stockholders granted voting control of their stock to the agents who, as to stockholder matters, were to vote it as seven agents might decide or as an arbitrator might rule.

The defendant stockholder Davies agreed in the instrument to vote as a director and the corporate shareholders agreed to use their best efforts to cause "their" representatives on the board of directors to vote, in effect, on all matters as determined by any seven of the agents. The corporate stockholders were authorized to remove their agents without cause. If any director voted contrary to such determination all parties to the Agreement agreed to cooperate and act in

any legal manner to remove, replace or cause the resignation of such a director. The shareholders pledged themselves through their agent-directors to confer on all matters involving American and in the event seven could not agree, "whenever possible to do so" to submit the matter to an arbitrator. Seven agents could vote to terminate the Agreement.

By this Agreement these stockholders and their representatives have agreed in advance to follow a procedure which if honored by the agents in their director capacity would obligate them to vote in a predetermined manner even though they might thereby be voting contrary to their own best judgment on matters within the province of the board. The Preamble of the Agreement, the identity of the agents and directors and the power of each stockholder with respect to his agent all tend to show that the stockholders were committing "their" directors, although called agents, to a plan whereby the action of seven agents or an arbitrator would constitute the action of the board of American.

Since Davies was both a signing stockholder and agent who had sufficient stock to elect one director, it is apparent that by Paragraph 3 of the Agreement he bound himself to vote as a director in accordance with the determination of at least seven director-agents or an arbitrator. This binding agreement by Davies alone was clearly illegal and because of the nature of the contract would be sufficient in and of itself to invalidate the instrument.

But defendants say the Agreement does not explicitly purport to authorize the shareholders, agents or directors to do anything illegal if a director-agent does not abide by the procedure set out in the Agreement. This would appear to be so but does that validate the Agreement? The instrument if valid binds the shareholders and through them their agents who are, in reality, the board. Because it tends to limit in a substantial way the freedom of director decisions on matters of management policy it violates the duty of each director to exercise his own best judgment on matters coming before the board. Moreover, a director-agent might here feel bound to honor a decision rendered under the Agreement even though it was contrary to his own best judgment.

It will not do to say that under the facts of present day corporate life each director would vote as "his" stockholder indicated anyway. See *McQuade v. Stoneham,* 263 *N.Y.* 323, 189 *N.E.* 234. So long as the corporate form is used as presently provided by our statutes this Court cannot give legal sanction to agreements which have the effect of removing from directors in a very substantial way their duty to use their own best judgment on management matters. Compare *Lippman v. Kehoe Stenograph Co.,* above.

Nor is this, as defendants urge, merely an attempt to do what the parties could do in the absence of such an Agreement. Certainly the stockholders could agree to a course of persuasion but they can-not under the present law commit the directors to a procedure which might force them to vote contrary to their own best judgment.

I am therefore forced to conclude that this Agents' Agreement is invalid as an unlawful attempt by certain stockholders to encroach upon the statutory powers and duties imposed on directors by the Delaware corporation law. My conclusions are based on the provisions of the Agreement which substantially encroach on the duty of directors to exercise independent judgment, upon the provisions which permit the possibility that director action will be dictated by an outsider and finally, upon the provision which can have the conse-quence of shifting control of the board from a majority to a minority.

Plaintiffs' motion for summary judgment declaring the Agreement invalid will therefore be granted.

In view of my decision it is unnecessary to consider the other objections to the Agreement raised by plaintiffs. If counsel feel that my decision does not dispose of the counter-claim of the resident corporate defendants I shall be happy to have their views thereon.

Order on notice.

### On Motion for Reargument.

This Court filed an opinion concluding that plaintiffs' motion for summary judgment declaring a so-called Agents' Agreement in-valid would be granted. Thereafter the appearing defendants (here-

after "defendants") except American moved for reargument on the ground that the stockholder provisions of the Agreement were severable from the director provisions and should not be declared invalid. As defendants correctly state, the Court declared the Agreement invalid solely because its provisions constituted an illegal restraint on director action. Therefore, although defendants' severability argument was advanced for the first time on its motion for reargument, the Court granted the motion because the delay worked no serious prejudice and the point advanced was of real substance. Pending a decision hereon, the Court reserved argument on plaintiffs' further contentions that the stockholder provisions are also illegal and that the Agreement is an illegal voting trust.

We commence an analysis of the severability issue by treating the director provisions of the Agreement as invalid and assuming the validity of the stockholder provisions.

The terms of the Agreement are set forth at length in the earlier opinion. The defendants say that the Court's decision in effect renders invalid only the last three paragraphs of numbered paragraph 3 of the Agreement. The first of these paragraphs is summarized in the earlier opinion commencing with the paragraph, "The shareholders undertook", and the second is quoted in full immediately thereafter. The third merely incorporates the first two paragraphs in the Voting Trust, if established.

Plaintiffs contend that the first two sentences of the second paragraph of numbered paragraph 3 must also be deleted under the prior decision. Those sentences plus that immediately following read as follows:

"The Agents, as soon as this Agreement becomes effective, shall appoint a chairman. The Agents shall consult and confer with each other either informally or at meetings, and shall make every effort to agree on how their votes are cast. In any case, where stockholder action is required, the chairman, on his own initiative, may or upon the request of any two Agents shall, call a meeting of the Agents on reasonable notice for the purpose of reaching an agreement on the manner of voting the stock subject to this contract. * * *"

To the extent that the first two sentences may be applicable to director action they are invalid. However, in their context both sentences can fairly be construed to apply to stockholder voting. Their validity when applied to that area is here assumed.

Under the prior decision, therefore, we have an agreement which has deleted therefrom so much of the Agreement as in words or effect committed the agents in their director capacities to follow predetermined decisions. As heretofore noted, the objectionable provisions are incorporated in the last three paragraphs (or parts thereof) of numbered paragraph 3.

█ Having identified the invalid portions of the Agreement, I now consider whether the Agreement can be enforced after the invalid provisions are severed therefrom. What is the judicial test? Our Supreme Court has said that intention governs whether a contract is divisible or entire. It is to be determined from the terms and subject matter of the contract, together with any pertinent facts or circumstances. *Orenstein v. Kahn,* 13 *Del.Ch.* 376, 119 *A.* 444; *Equitable Trust Co. v. Delaware Trust Co.,* 30 *Del.Ch.* 118, 54 *A.2d* 733.

Since this matter is before the Court on plaintiffs' motion for summary judgment we look first at the terms and subject matter of the Agreement and thereafter we will consider whether other material facts and circumstances appear in the papers filed.

A recital in the Agreement states the intent and purpose of the parties in signing it. While this recital was quoted in the prior opinion, for ease of treatment, it is here repeated:

> "Whereas, the parties do hereby agree and declare that the intent and purpose of this Agreement is to provide a means whereby the parties hereto may initiate or maintain in effect any general policy, plan or program affecting American Independent Oil Company which said parties should determine to be to their joint benefit, interest and advantage, and to the best interest of all stockholders of American Independent Oil Company, and to that end to elect or retain or replace any officer, executive or employee of said company; * * *".

It can be seen from the language of the Agreement that the parties desired to set up the mechanics of a plan which would permit them to initiate or maintain any agreed policy, plan or program which they determined was desirable for them and for American. To this end they would elect, or retain or replace any officer, executive, or employee of American. Assuming as we do that the stockholder provisions are invalid, let us see whether the intent and purpose of the recital can be fairly implemented by the provisions of the Agreement remaining after the deletion of the director provisions. The stockholder provisions require the stockholders to deliver their stock to their designated Agents along with proxies and give such Agents exclusive voting power of such stock during the period of the Agreement. The Agreement became effective only when stockholders owning at least 50% of the stock became parties thereto. Consequently the stockholder provisions here embrace Agents having voting control of the corporation and set up the mechanics whereby such voting control can be exercised in any area of legitimate stockholder activity.

The Agreement as a practical matter renders it certain that the Agents will by their stockholder action reflect the will of the stockholders who selected them. It also provides the mechanics whereby the determination of the requisite number of stockholders as to any policy, plan or program can be ascertained, expressed and implemented. The assurance that it will be implemented arises from the power of the Agents to elect the majority directors under the provisions of the Agreement, as well as their power to elect the corporate officers and agents if the by-laws so provide. 8 *Del.C.* § 142(a) and (c).

Can it be said that these powers fairly tend to provide the parties to the Agreement with the mechanics legally necessary to implement their stated intent and purpose in executing the Agreement? I think so.

The power of the stockholders, particularly the majority, is a most persuasive factor in molding director opinion. Thus, it is ignoring the realities of corporate life to suggest that the invalidity of the

director provisions has the effect of substantially impairing majority stockholder influence upon the decisions of the corporate executives, officers, and employees. Certainly the continuing power to elect directors, officers and agents is strongly calculated to insure that such personnel will carry out any policy, plan or program adopted by the majority stockholders in accordance with the terms of the Agreement.

Plaintiffs say that directors cannot be removed and the absence of this power tends to defeat the expressed purpose and intent of the parties to the Agreement because they lose the power over director action which the invalid director provisions gave them. Assuming without deciding that directors cannot be removed, the fact remains that even under the invalid director provisions there was no provision attempting to take illegal action to remove a director acting contrary to the determination of the Agents. Thus in the case of a disobedient director the situation was the same whether or not the director provisions were invalid. This is so because in either case the parties agreed only to take action within the law to remove such a director. Nor can I see any merit to plaintiffs' claim that the provisions for converting the Agreement into a formal voting trust show that the director provisions are not severable. The problem is the same whether viewed as now constituted or as a Voting Trust.

In view of the fact that the stockholder provisions alone, assuming them to be valid, can fairly and realistically implement the stated intent and purpose of the Agreement, I believe it fair to conclude that the parties would have intended to have the Agreement stand even though the director provisions were declared invalid.

My conclusion is further supported by what I consider to be certain pertinent facts and circumstances shown in the defendants' affidavits. They recite that the Agreement was executed to prevent the plaintiff Phillips Petroleum Company from gaining control. It is alleged that it was understood by the stockholders when American was organized that it would remain independent of the control of Phillips or any other single interest. Numerous other recitals are added to show why this was important. Plaintiffs dispute these facts

in their papers but for present purposes they argue that even if true they are not material. I disagree because if the stockholder provisions alone are calculated to produce that result then such facts are material to the severability issue.

It is evident that if the motive of the signatories was to prevent Phillips from obtaining control, and I am not now concerned with the validity of such motive, then the stockholder provisions alone may well produce that result during the life of the Agreement. I say this because the parties, having majority control, can under the mechanics of the Agreement elect the personnel responsible for the operation of American. Consequently these facts and circumstances tend to give further support to the conclusion that the parties would have wanted this Agreement even had they known that the director provisions would be declared invalid.

At this stage of the proceedings I conclude that the stockholder provisions of the Agreement are severable from the invalid director provisions and consequently the stockholder provisions cannot be declared invalid.

In view of my decision an order may be presented fixing a brief schedule on the questions heretofore reserved.

### SUPPLEMENTAL OPINION.

Plaintiffs contend that the Agreement as delimited by the earlier opinions is invalid because it is a voting trust which fails to comply with the Delaware Voting Trust statute. They contend, alternatively, that it cannot be sustained either as a pooling agreement or an irrevocable proxy. Defendants naturally take a contrary position.

Let us first consider whether the Agreement is in substance a voting trust.

"* * * whether a particular agreement constitutes a voting trust, and, therefore, what its real purpose and intent is must ordinarily be ascertained from the provisions of that instrument, when read as a whole and the rights and powers given thereby." *Aldridge v. Franco Wyoming Oil Co.*, 24 *Del.Ch.* 126, 7 *A.2d* 753, 764, affirmed 24 *Del.Ch.* 349, 14 *A.2d* 380.

The Agreement itself provided the mechanics for the possible creation of a voting trust in the future. Thus, insofar as they explicitly expressed themselves as to their intention, it is clear that the parties did not intend to enter into a voting trust when they executed the Agreement. However, let us determine whether a voting trust was nevertheless established by virtue of the provisions employed in the Agreement.

Plaintiffs say that under the Agreement legal title to the stock passed to the agents. From this premise they conclude that the agents were in effect trustees in the same sense as voting trustees. Plaintiffs rely upon the provisions of the Agreement to the effect that the stockholders were to deliver their certificates with stock powers to their agents and receive a receipt therefor. However, by its terms, as soon as the Agreement became effective the agents were required to deliver the certificates and powers to an escrow agent to hold them for the term of the Agreement, unless sooner withdrawn by seven of the eight agents. The same procedure applied to pledged and additional shares. These provisions certainly precluded the agents from holding legal title during the time the escrow agent retained the certificates and powers because no individual agent had power over them.

But plaintiffs contend that when the provisions of the Agreement are considered in conjunction with 8 *Del.C.* § 181, the delivery of the stock certificates and stock powers endorsed in blank vested the legal title in the agents. That statute, which is a part of the Uniform Stock Transfer Act, does not apply to action under the provisions of the present Agreement. Under this Agreement the Agents were merely convenient custodians of the certificates and powers until the Agreement became effective. Immediately thereafter they were required to deliver them to an escrow agent. Certainly, the delivery from the stockholders to the agents was not a "delivery" under the statute for the purpose of transferring title to such agents.

In view of my analysis of the Agreement, it is not necessary to decide the legal effect of Section 181 of the Uniform Stock Transfer

Act in the situation where agents actually hold certificates and stock powers for the term of an agreement such as that here involved.

By way of contrast, the Voting Trust statute, 8 *Del.C.* § 218, contemplates an agreement by which the signing stockholders authorize the trustees to transfer record title to their own names as trustees for the period of the trust. Paragraph 1 of the Agreement does provide for withdrawal of the certificates and powers by seven agents. Such a right, whatever its purpose, did not itself give the agents the status of legal holders of the stock.

Plaintiffs argue that under Paragraph 7, the agents could withdraw the stock and powers and cause the certificates to be exchanged for new certificates to the agents.[2] I think the language of Paragraph 7 clearly shows that this language relates solely to a transfer to the agents as voting trustees in the event a voting trust is created. It therefore has no applicability to our case.

The agents here vote solely by virtue of proxies given by their principals. As the Supreme Court said in the *Ringling* case, "* * * the [voting trust] statute does not purport to deal with agreements whereby shareholders attempt to bind each other as to how they shall vote their shares". *Ringling Bros.-Barnum & Bailey Combined Shows v. Ringling*, 29 *Del.Ch.* 610, 53 *A.2d* 441, 447. This, as I construe the Agreement, is essentially what the stockholder agreed to here, albeit through agents.

Plaintiffs insist that this is a voting trust because the agents have sole and exclusive voting power during the term of the Agreement. The answer, as hereafter noted, is that they are the agents of the stockholders they represent and are clearly subject to the directions of their principals. Only in case of disagreement is there a real possibility that any stockholder's shares will be voted contrary to his wishes as indicated to his agent.

■ Since a voting trust is a true trust and since it was not intended under the terms of the Agreement that the legal title should

---

2. "Any seven of said Agents may at any time withdraw said stock certificates from escrow and transfer said stock to the persons then acting as Agents, as trustees to be held under a voting trust. * * *"

pass to the agents, it follows that the Agreement is not and was not intended to be an Agreement of the type covered by our Voting Trust statute. See *Adams v. Clearance Corp., ante p.* 459, 121 *A.2d* 302; 5 Fletcher *Cyc. of Corps. (Perm.Ed.)* § 2079.

The Agreement is therefore not invalid for failure to comply with the Delaware Voting Trust statute.

Let us now consider whether, as plaintiffs contend, the Agreement is an invalid pooling agreement because of the provisions concerning the voting of the stock. To some extent the arguments will duplicate those just considered. Plaintiffs say that the sole and exclusive voting power of the stock is vested in the agents. This, they say, is not compatible with pooling agreement concepts since the shareholders do not bind each other as to how they shall vote, but rather provide for the voting to be done by the agents.

As heretofore noted, plaintiffs' contention ignores the conclusion that the "Agents" are in fact the agents of the stockholders and subject to the control and direction of the shareholders by whom they are appointed. The Agreement provides that the agents are to represent specific shareholders. Each is subject to the control of the shareholder who selects him and he may be removed at any time at the will of such shareholder. The Agreement also provides:

> "The Shareholders agree that subject to the provision of paragraph 5 of this Agreement [not here relevant] they will use their best efforts to cause the Agents now or hereafter representing the corporate Shareholders hereunder to be and remain identical with the persons representing said corporate Shareholders on the Board of Directors of American Independent Oil Company. The Shareholders agree that they will exercise their right to nominate Agents as provided in paragraph 4 of this Agreement so far as possible in accordance with the foregoing policy."

What greater guarantees of agent-principal responsibility can be imagined? The quoted provision also helps to answer plaintiffs' contention that the provision for consultation among the agents was

pointless if the agents were required to vote the wishes of their principals. This is so because in reality the agents were to be the members of the Board of Directors selected by the stockholders signing the Agreement.

Actions by an agent within the scope of his authority are in law the actions of his principal. Since these agents are true agents and subject to the control of the shareholders by whom they are appointed, it is the shareholders who are voting when their agents vote. Only when there is disagreement can it be said that an agent may possibly be voting the shares contrary to the wishes of his principal. As hereafter noted, I do not believe this possibility renders the pooling agreement invalid.

Plaintiffs place great reliance on *Smith v. Biggs Boiler Works Co.*, *32 Del.Ch.* 147, 82 *A.2d* 372. There the Acting Vice Chancellor held that in a pooling agreement the owners of shares combine and vote them in accordance with the agreement. But he concluded that since one of the parties to the agreement was not an owner of stock, it could not be construed to be a pooling agreement. In our case, there was no outsider to the Agreement since it was between and among the stockholders and their agents. Thus the ruling in *Smith v. Biggs Boiler Works Co.*, above, is not applicable.

Plaintiffs contend that since the agents are required to vote according to the dictates of seven of the eight agents, or an arbitrator, the wishes of the stockholders who select the agents are irrelevant and ineffective. However, the agents, representing the stockholders, are required first to attempt to reach an agreement for unified voting. It is only in case of disagreement that the wishes of one stockholder must be frustrated. By its very nature a pooling agreement admits of the possibility of differences among the stockholders. Consequently, such an agreement, to be effective, must not only recognize the possibility of differences but must also provide the mechanics for resolving them in a manner which will permit collective action. Where, as here, all the stockholders, with one exception, are corporations, it was necessary that they act through agents. Where there is dis-

agreement the provision first requiring an agreement of seven or failing that a reference to an arbitrator seems as reasonable under the circumstances as the "arbitration" provisions upheld by our Supreme Court in *Ringling Bros.-Barnum & Bailey Combined Shows v. Ringling*, 29 *Del.Ch.* 610, 53 *A.2d* 441.

I conclude that the Agreement is a valid pooling agreement which is not rendered illegal either because the voting is done by agents or because, in case of disagreement, the agents vote on the basis of the decision of seven agents or an arbitrator.

Finally, plaintiffs argue that the irrevocable proxy provisions of the Agreement are not binding because the proxies are not coupled with an interest. I have some doubt that this matter is now appropriate for decision. Plaintiffs are not parties to the Agreement. However, since defendants make no point of this and since the facts show that its ultimate determination is almost inevitable I shall resolve it.

Paragraph 3 of the Agreement provides in part as follows:

"3. During the term of this Agreement the Agents or their successors shall have the sole and exclusive voting power of the stock subject to this Agreement. The Shareholders shall deliver to the Agents and shall keep in effect during the life of this Agreement proxies giving said Agents or their successors jointly and each of them severally, with full power of substitution to any or all of them, the power to vote the stock at all regular and special meetings of the stockholders and to vote for, do or assent or consent to any act or proceeding which the Shareholders of said corporation might or could vote for, do or assent or consent to. * * *"

The following portion of Paragraph 6 is also pertinent:

"6. Except as herein otherwise provided, the proxies to be given hereunder shall not be revoked and the powers herein delegated to said Agents shall be irrevocable during a period of ten years from and after the date of said Agreement. * * *"

The Delaware statute permits stockholders to give proxies which by their terms may be irrevocable for a period which would cover the term of this agreement. 8 *Del.C.* § 212. But the courts rather uniformly state that a proxy power must be coupled with an "interest" in order to be irrevocable. In *Hunt v. Rousmanier's Adm'rs,* 8 *Wheat.* 174, 5 *L.Ed.* 589, Chief Justice Marshall introduced the term "coupled with an interest" into the American laws of powers, but that case on its facts is of little assistance here.

When the courts first came to apply Marshall's expression to the corporate proxy field they tended to circumscribe the principle severely. This rigid approach was caused by the early prejudice against the so-called separation of voting rights from ownership. However, the changing needs of a dynamic commercial world soon required greater tolerance toward this useful device.

To state that a principal has the right to revoke a proxy is but to say that generally a principal may terminate an agency relationship even if he thereby becomes liable in damages. But in some cases damages are quite inadequate relief to the party for whose benefit the proxy is given. This is so, for example, in those cases where the contracting parties commit themselves to a uniform policy which they desire to implement by maintaining corporate control for a reasonable period. The irrevocable proxy device is ideally suited to effectuate this purpose.

The defendants here felt that American would be better as an independent company and for present purposes we must assume that they, being the majority stockholders, signed the Agreement believing that it would help secure that objective. They also had the qualified right to purchase proportionately the stock of any selling shareholder. It also appears to be an uncontroverted fact in the record that subsequent to the date of execution of the Agents' Agreement, the defendants advanced substantial additional sums of money for the use of American.[3] I think a reasonable inference from this fact is that

3. If the plaintiffs feel that the record does not support this statement, they should so indicate to the court.

the defendants advanced such sums of money at least in partial reliance upon the validity and effect of the Agents' Agreement, including the implementing irrevocable proxy provisions. Certainly each party had much more than a mere agent's interest in the voting of the stock. See 159 *A.L.R.* 309; Note 98 *U. of Pa.L.Rev.* 401, 405; Compare 5 *Fletcher,* above § 2062, *pp.* 239-240.

Here the stockholders have jointly obligated themselves as part of a binding pooling agreement to give a proxy and to keep it in effect during the term of the Agreement. The requisite legal consideration exists (see the *Ringling* case). Where there is a legal agreement between stockholders, as opposed to a mere principal-agent situation, I believe the parties may agree to and be bound by a provision by which they commit themselves to keep an irrevocable proxy in effect in order that the so-called "arbitration" provisions of the Agreement may be implemented. This is particularly true where a strong element of reliance is involved. The parties committed themselves through their agents but certainly the irrevocability question cannot turn upon this factual distinction. The proxy provisions were almost indispensable if the pooling agreement was to be really effective. Indeed, it was solely for want of such an explicit provision that the Supreme Court concluded in the *Ringling* case that the shares of the recalcitrant stockholder could not be voted by the other party.

*In Re Chilson,* 19 *Del.Ch.* 398, 168 *A.* 82, is relied upon by plaintiffs. There it was assumed by the Master that an illegal voting trust agreement was a valid proxy agreement. Then it was decided that the proxies were not irrevocable because they were not coupled with some interest in the stock itself. The Master's report as confirmed by the Court contains several sweeping assumptions. Moreover, and of real importance, the Master appears to have formulated an exclusive rule of law based, in part, upon the absence of precedent. In laying down a general rule he did not have before him and thus did not consider, *inter alia,* a case where there is financial reliance placed on an agreement providing for irrevocable proxies. Indeed, it is doubtful if one case which was therein distinguished (*Smith v.*

*San Francisco & N.P. Ry. Co.,* 115 *Cal.* 584, 47 *P.* 582, 35 *L.R.A.* 309) is in reality anything more than a reliance case.

Since the Master in the process of his formulation of an all-embracing rule of proxy law did not have before him or consider the irrevocable proxy from the reliance point of view, I do not believe the *Chilson* case can be considered binding precedent here. Moreover, its application to situations other than the simple principal-agent relationship is of doubtful validity. Compare *Deibler v. Chas. H. Elliott Co.,* 368 *Pa.* 267, 81 *A.2d* 557.

For the reasons given I conclude that the proxies are irrevocable.

Since plaintiffs have failed to show that the stockholder provisions are invalid, it follows that the motion for summary judgment will be granted only to the context of declaring the director provisions invalid.

Order on notice.